117 N.J. Super. 315 (1971)
284 A.2d 549
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
MILTON YORMARK, DEFENDANT-APPELLANT. STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
STANLEY PERWIN, DEFENDANT-APPELLANT. STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
ROBERT B.J. MULVANEY, DEFENDANT-APPELLANT. STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
J.L. BRIZARD, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued September 13, 1971.
October 5, 1971.
Decided November 30, 1971.
*322 Before Judges GOLDMANN, COLLESTER and MINTZ.
Mr. Raymond A. Brown argued the cause for appellant Milton Yormark (Mr. Irving I. Vogelman on the brief; Messrs. Brown, Vogelman, Morris & Ashley, attorneys).
Mr. Arthur J. Timins argued the cause for appellant Stanley Perwin (Messrs. Grinchis & Timins, attorneys).
Mr. Richard S. Lehrich argued the cause for appellant Robert B.J. Mulvaney (Mr. Matthew P. Boylan of counsel; (Messrs. Lowenstein, Sandler, Brochin, Kohl & Fisher, attorneys).
*323 Mr. George P. Helfrich argued the cause for appellant J.L. Brizard (Messrs. Helfrich & Gallagher and Mr. George R. Sommer, attorneys).
Mr. David S. Baime and Mr. Alan Silber, Assistant Prosecutors, argued the cause for respondent (Mr. R. Benjamin Cohen, Assistant Prosecutor, on the brief; Mr. Joseph P. Lordi, County Prosecutor, attorney).
The opinion of the court was delivered by COLLESTER, J.A.D.
The four defendants appeal from their respective convictions, following a jury trial, of conspiracy to obtain money under false pretenses from the Maryland Casualty Company, in violation of N.J.S.A. 2A:98-1. Yormark and Perwin also appeal from their convictions on three-count indictments charging them individually with obtaining money under false pretenses from the Maryland Casualty Company, in violation of N.J.S.A. 2A:111-1. All of the indictments were consolidated for the purpose of trial.
Following the convictions Yormark, Perwin and Mulvaney were each sentenced on the conspiracy indictment to penitentiary terms of 18 months, 12 months in custody and 6 months on probation, and fined $1,000. Brizard was sentenced to a penitentiary term of 18 months, 6 months in custody and 12 months on probation, and fined $1,000. Yormark was sentenced on the three-count indictment for obtaining money under false pretenses, as follows: on the first count to a penitentiary term of 18 months, 12 months in custody and 6 months on probation, to be served consecutive to the sentence imposed on the conspiracy indictment, and fined $1,000; on the second count to a concurrent penitentiary term of 18 months, 12 months in custody and 6 months on probation, and fined $1,000; and on the third count to a concurrent penitentiary term of 18 months, which was suspended, probation for 18 months imposed, and a $1,000 fine levied. Perwin was sentenced on the three-count *324 indictment for obtaining money under false pretenses, as follows: on the first count to a penitentiary term of 18 months, 12 months in custody and 6 months on probation, to be served consecutive to the sentence imposed on the conspiracy indictment, and fined $1,000; and on each of the second and third counts to a concurrent penitentiary term of 18 months, 12 months in custody and 6 months on probation, and to pay a fine of $1,000. In addition to the above sentences Yormark, Mulvaney and Brizard were each ordered to pay $16,750, representing one-quarter of the costs of prosecution.
The conspiracy indictment charged that Yormark and Perwin, attorneys of this State, Mulvaney and Brizard, physicians of this State, and Vincent Morelli and Albert Albrizio conspired with Anthony Cortese, a claims supervisor of the Maryland Casualty Company, to obtain money under false pretenses from the insurance company, Cortese, although named as a co-conspirator, was not included as a defendant in the indictment. Morelli and Albrizio were severed from the indictment at the outset of the trial. Cortese and Morelli testified on behalf of the State.
The trial extended over a period of four months. The State's proofs revealed that in May or June 1967 Morelli, whose wife's automobile was insured by the Maryland Casualty Company, together with Leo Jeronowitz, the owner of an automobile body repair shop, and Cortese initiated a plan to defraud the insurance company. Jeronowitz was prevented from thereafter playing an active role in the conspiracy because of a serious illness which proved fatal on September 22, 1967.
The plan agreed upon was that Morelli would report a fictitious automobile accident to his wife's insurance carrier, admitting that he had caused the accident while driving his wife's car, with resulting property damage and personal injuries sustained by fictitious occupants of the other vehicle. Cortese would arrange for payment of the fraudulent claims submitted.
*325 In August 1967 Morelli and Cortese decided to put their plan into operation. It was agreed that the six bogus claimants should be represented by two different attorneys in order to make the case look more legitimate. Cortese said he would get Perwin to act as one of the attorneys; Morelli was to secure the other. Morelli concocted the following names for the claimants: Joseph Taylor as the owner and operator of the other car, and Frank Taylor, Charles Taylor, John McBride, Sr., John McBride, Jr. and Phillip Allison as the passengers.
Thereafter Cortese telephoned Perwin and arranged for him to represent the three Taylors in their claims against the company which he, Cortese, would personally supervise. Perwin agreed to secure medical bills of about $200 for each of the Taylors and to send a letter to Mrs. Morelli stating that he represented them. Perwin subsequently sent the letter and notified Cortese that Dr. Mulvaney was the "treating physician."
Meanwhile, Morelli asked one Hy Chuven to get a lawyer to handle a "phony" accident case. That evening, or the next, Morelli received a telephone call from Yormark, who said he was a friend of Chuven's. Morelli told Yormark he wanted him to represent three of six claimants in a bogus accident case; that the insurance carrier was the Maryland Casualty Company; that Cortese would handle the claims, and that the "accident" had not yet happened because they had not decided "where it would be." Morelli informed Yormark that he would have to provide the necessary doctor's bills. Yormark agreed to handle the claims, said he knew Cortese and would work it out with him, and asked Morelli to have Cortese call him. Morelli reported the conversation to Cortese, who telephoned Yormark and confirmed the arrangement. Yormark agreed to obtain medical bills for each bogus claimant in approximate amounts of $200. It was not until several weeks later that Cortese supplied Yormark with the names and addresses of his fictitious clients and told him to send a letter of representation to Morelli. *326 Yormark then told Cortese that Dr. Brizard would be the treating physician.
With the preliminary part of the plan completed, Morelli on August 18, 1967 reported to the insurance company that while driving his wife's automobile on the previous day he had collided with another motor vehicle on the J Street ramp of the Manhattan Bridge in New York City. He gave the names and addresses of the fictitious occupants of the other car.
The property damage claim for the Taylor car was paid by an insurance company check issued by Cortese in the amount of $3,400 payable to "Joseph Taylor." The check was given to Morelli, who cashed it through Albert Albrizio. The proceeds were shared by Morelli and Cortese.
After Yormark sent his letter of representation to Morelli and notified Cortese that Dr. Brizard would be the treating physician, Cortese told Morelli to arrange to have three persons go to Brizard's office. Morelli, his brother Peter, and a third person, posing as the McBrides and Allison, went to the doctor's office. They told Brizard they had been sent by Yormark. There was no medical examination; Brizard merely wrote down some information and said he would send reports to Yormark. Cortese subsequently received from Yormark Dr. Brizard's medical bills for the claimants, each in the approximate amount of $200. Thereafter Cortese arranged for Morelli to have the same imposters, posing as the McBrides and Allison, examined by Dr. Jack Siegal for the insurance company. A similar arrangement was made for them, posing as the Taylors, to be examined by Dr. S. Wolfe Emmer for the company. While Morelli and his cohorts fooled Dr. Siegal completely, Dr. Emmer sent a confidential letter to Cortese reporting that he did not believe the three men he had examined. Cortese immediately destroyed the letter.
In November 1967 Cortese called Yormark and advised him of the payments that would be made to settle the McBride and Allison claims. There were no negotiations; *327 Yormark accepted the figures. Cortese had Yormark prepare releases in blank for each claimant. The releases and Brizard's medical bills were sent to Cortese. Cortese gave the releases and insurance company drafts, made payable to Yormark and his clients, to Morelli, who arranged to have the signatures of the claimants forged and the releases notarized. After Morelli returned the documents Cortese met Yormark at the latter's office and gave him the checks. Yormark endorsed and deposited them in his trustee account. After deducting his fee for each case Yormark issued checks payable to his fictitious clients and gave them to Cortese. Cortese turned them over to Morelli, who had the names of the McBrides and Allison forged and deposited them in a savings and loan account opened for that purpose. The funds were later withdrawn and divided by Morelli and Cortese.
The same procedure was substantially followed in the settlement of the Taylor claims with Perwin. There were no negotiations. Cortese fixed the amount for each claim; Perwin submitted the releases drawn in blank, together with Dr. Mulvaney's bills for the three claimants. Cortese issued company checks for each claim, payable to Perwin and the claimant, and turned them over, together with the releases, to Morelli. Morelli had the Taylor names forged thereon and the releases notarized. Cortese then took the checks to Perwin's office and received in return checks drawn on Perwin's office trust account payable to each of the Taylors, less Perwin's fees. Cortese turned these checks over to Morelli, who had them forged and cashed. The proceeds were shared by Morelli and Cortese. Perwin gave a check in the amount of $300 to Dr. Mulvaney instead of the charges, totaling $685, which appeared on his bills.
Defendants denied the charges in the indictments. Yormark testified that on September 27, 1967 the two McBrides came to his office and arranged that he represent them and Phillip Allison in their personal injury claims arising out of an automobile accident which occurred on August 17. *328 They said they were passengers in a car operated by Morelli and had been treated by Dr. Brizard. The case was settled following negotiations with Cortese on November 24, 1967, and releases for the three men were sent to McBride, Sr. at his place of business with instructions that they be signed and notarized. When the releases were returned Yormark sent them, together with Brizard's medical bills to the insurance company. Yormark said that upon receipt of the insurance company checks he delivered over checks, less his fees, to the McBrides and Allison at his office. He denied having even talked to Morelli and said that prior to negotiating the settlement he had never talked to Cortese about the case. He also denied that the McBrides and Allison were sent to him by Chuven and claimed he had never heard of the Taylors.
Defendant Perwin claimed that he had been duped by Cortese. He testified that his first knowledge of the Taylor claims was on August 25, 1967 when Cortese telephoned that he had a case for him. Cortese gave him the names of the Taylors and said they were friends of his. As a result he wrote a letter of representation to Mrs. Morelli. He testified that Cortese told him the Taylors were being treated by Dr. Mulvaney. He admitted that he never met the Taylors and was never informed of the extent of their alleged injuries. He later received Dr. Mulvaney's bills and negotiated a settlement of the claims with Cortese. He prepared the releases and sent them to Cortese to be executed by the Taylors, together with the medical bills. Cortese thereafter brought the company checks in payment of the claims to his office. The checks were deposited in a trust account and checks, made payable to the Taylors less his fees, were delivered to Cortese. He denied ever talking to Dr. Mulvaney about the claims and said he had no knowledge that Yormark represented other persons allegedly injured in the accident.
Dr. Mulvaney testified that he had no independent recollection of having treated the Taylors. He relied upon his *329 office records, which indicated that the Taylors had first come to him for treatment on August 18, 1967 and that he had treated them thereafter. He verified the bills submitted by Perwin as his and admitted that Perwin had paid him $300, which was less than the amount of his bills. Mulvaney testified that he had not known Morelli or Dr. Brizard before the trial.
Dr. Brizard testified that he had examined and treated the McBrides and Allison but could not produce his records which, he said, had been lost or destroyed. He sent Yormark a bill for treatments rendered, but could not recall whether he had been paid. Brizard said that the only person he knew previous to the trial was Yormark.

I
Defendants claim they were unfairly prejudiced by their misjoinder in the indictment charging a single conspiracy and the trial court's refusal to grant motions for severance made during the course of the trial. They argue that the evidence, at best, disclosed at least two separate unconnected conspiracies: (1) Cortese, Perwin and Mulvaney; (2) Morelli, Cortese, Yormark and Brizard, and probably more, and not a single overall conspiracy as charged by the State. They contend that the improper joinder subjected each to "spill-over" prejudice and transference of guilt which emanated from evidence relating to the activities of the other defendants. They argue that the evidence failed to connect Yormark with Brizard and Perwin with Mulvaney, and that there was no proof that each defendant knew the other three.
Defendants rely primarily on Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), where the Supreme Court reversed the convictions of several defendants on the ground that a material variance between the charge of one conspiracy in the indictment and proof of eight or more separate conspiracies at the trial was *330 prejudicial. We conclude that Kotteakos, and other cases cited by defendants, concerning prejudice resulting from the trial of an indictment for one conspiracy where there were in fact multiple conspiracies, are factually distinguishable from the instant case and not applicable.
An agreement or combination between two or more persons to commit a crime constitutes an unlawful conspiracy if there has been an overt act in furtherance of the agreement or combination. State v. Dennis, 43 N.J. 418, 423 (1964). The gist of the offense is the criminal agreement, State v. La Fera, 35 N.J. 75, 86 (1961), which may be established by inferences drawn from the circumstances, State v. Carbone, 10 N.J. 329, 341-342 (1952). It must be shown that each defendant entered into the agreement with one or more persons, whether charged with him in the indictment or not, and whether known or unknown. It is not essential that there be direct contact between the parties, or that all enter into the conspiratorial agreement at one and the same time. It may be that they have never seen each other or heard the name of the other, and yet by law they may be parties to the same common criminal agreement. Id. at 337-338. Thus, proof of the least degree of concert of action between the parties is sufficient to establish the existence of a conspiracy. See also State v. Hutchins, 43 N.J. 85, 91-93 (1964), and cf. State v. Burgess, 97 N.J. Super. 428, 432-434 (App. Div. 1967).
From our review of the record we are satisfied that there was only one conspiracy  an unlawful combination to obtain money under false pretenses from the Maryland Casualty Company by concocting a fictitious automobile accident and submitting false damage claims for bogus claimants. The conspiracy was initiated by Morelli and Cortese, who brought Yormark and Perwin into the conspiracy to submit fraudulent claims to the company and who, in turn, arranged for Dr. Mulvaney and Dr. Brizard to prepare false medical reports and bills for the bogus claimants. We conclude that there was ample direct and circumstantial evidence *331 to support the State's charge that defendants were involved in a single overall conspiracy. The record clearly discloses that each of the four defendants played his separate role in the execution of the common criminal scheme. While each was to obtain a share of the proceeds of the fraud, separate and apart from that obtained by the others, this division of the spoils depended upon the accomplishment of the common objective.
It is also argued that defendants were prejudiced by a single trial of offenses which were in no way connected, i.e., the substantive charges against Yormark and Perwin. The consolidation of the trial of a conspiracy indictment with the substantive offense is generally proper, State v. Cromier, 46 N.J. 494, 504 (1966), and our rules permit the joinder of offenses charged against each defendant if they are of the same or similar character and also are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan. R. 3:7-6. The rules also provide for the joinder of defendants if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. R. 3:7-7.
The granting of a motion for severance is discretionary with the trial court. R. 3:15-2. The rule is declaratory of the long-settled practice in this State. State v. Rios, 17 N.J. 572, 584 (1955). Denial of such a motion will not result in a reversal unless it is clearly shown that the trial court's action constituted an abuse of the court's discretion. See State v. Sinclair, 49 N.J. 525, 550 (1967), and State v. Manney, 26 N.J. 362, 368 (1958). Here the conspiracy and the substantive offenses charged against Yormark and Perwin all arose out of the same criminal transaction. The trial court repeatedly instructed the jurors to give their separate consideration as to whether each particular defendant was guilty of the crimes charged against him, and to consider each piece of evidence only as it related to the particular defendant to whom they found it applicable. We *332 have no cause to believe that the jury did not comply with the trial court's instructions.
We are satisfied that there was neither a prejudicial misjoinder nor a variance between the indictment charging a single conspiracy and the proofs adduced at the trial, and that there was no error in the denial of motions for severance.

II
Defendants Perwin and Mulvaney charge that the trial court erred in denying their pretrial motions to dismiss the conspiracy indictment on the ground of double jeopardy and collateral estoppel.
Their claim is bottomed on their prior acquittals following the trial of a six-count indictment. Three counts charged these defendants with separate offenses of obtaining money by false pretenses from the Maryland Casualty Company based on nonexistent accidents (N.J.S.A. 2A:111-1), and three counts charged them with separate conspiracies to commit such crimes (N.J.S.A. 2A:98-1). More specifically, the three counts charging the substantive crimes alleged that the insurance company, based on the false representations of these defendants, paid the following bogus claims: (1) $2,050 to Joseph Vesper for injuries allegedly sustained in an accident on October 15, 1966; (2) $2,175 to Willie Lewis for injuries allegedly sustained in an accident in March 1967; and (3) $2,150 to Joseph Mozzocca for injuries allegedly sustained in an accident on April 19, 1967.
Perwin and Mulvaney allege that the essence of the conspiracies charged in the prior trial was that they conspired to defraud the insurance company over the period from September 15, 1966 to February 16, 1968, while the conspiracy charged in the present indictment allegedly occurred between August 1, 1967 and February 2, 1968 within the same time period. They argue that the State impermissibly carved an alleged single, continuous conspiracy into four *333 separate conspiracies and that since they were acquitted of the three conspiracies charged in the prior trial the State was barred under the principles of double jeopardy and collateral estoppel from prosecuting the conspiracy charged in the present indictment.
The constitutional guarantee of double jeopardy bars the State from subjecting a defendant to the hazards of a trial and possible conviction more than once for the same alleged offense. State v. Farmer, 48 N.J. 145, 167 (1967), cert. den. 386 U.S. 991, 87 S.Ct. 1305, 18 L.Ed.2d 335 (1967). The rule of collateral estoppel directs that once an issue of ultimate fact has been litigated and determined by a valid and final judgment, the issue cannot again be relitigated in a subsequent proceeding between the same parties. State v. Cormier, 46 N.J. 494, 505 (1966).
Tested by these rules we are satisfied that neither double jeopardy nor collateral estoppel is involved in this case. Ashe v. Swenson, 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970); State v. Ferrante, 111 N.J. Super. 299 (App. Div. 1970), and other cases relied upon by defendants are factually inapposite.
The agreements underlying the three conspiracies charged in the former trial were separate, distinct and different from that charged in the instant case. There was no evidence that the four agreements were tied together as stages in the formation of one larger, all-inclusive combination directed to achieving a single unlawful end result. On the contrary, each separate agreement had its own distinct illegal end  each goal was an end in itself, separate from the others. In fact, it is undenied that defendants never claimed during the prior trial that the three conspiracies charged in that indictment comprised one single conspiracy. The parties involved in the four conspiracies were different, the fictitious accidents alleged to have taken place in the prior indictment occurred prior to that charged in the instant case, and the "Taylor" conspiracy was never an ultimate fact for determination by the jury in the previous *334 trial. There was no double jeopardy or collateral estoppel to bar the prosecution of the indictment in this case.

III
Perwin, Mulvaney and Yormark allege that the court committed reversible error by permitting the State to introduce in evidence irrelevant and prejudicial collateral matters. The testimony, which was adduced on cross-examination of defendants and on rebuttal, related primarily to other transactions of defendants with Cortese and the Maryland Casualty Company, the close relationship between Perwin and Dr. Mulvaney, and a similar relationship between Yormark and Dr. Brizard. We think it appropriate to refer to some of the testimony which defendants claim was prejudicial.
Perwin was cross-examined concerning the settlement of other cases with the insurance company that had been referred to him by Cortese. He admitted he never saw the claimants in six cases and that Cortese "controlled" the claims for the company. Included were the claims of Vesper, Lewis and Mozzocca that were involved in the prior trial for conspiracy in which Perwin and Mulvaney had been acquitted. In all six cases above referred to, with the exception of the Mozzocca claim, Mulvaney was the treating physician, and while his medical bill in each case exceeded $200 the doctor accepted flat fees of $100 from Perwin.
One case involved a claim by Zeno and Frances DiBella for injuries allegedly received in an accident while passengers in an automobile operated by Steven Churlen. The treating physician was Mulvaney, who submitted bills for $250 and $150, respectively, and was paid a total of $200 by Perwin. Mulvaney testified on cross-examination that he had treated the DiBellas. The insurance company settled the claim with Perwin for $1,500 and issued checks payable jointly to Perwin and the DiBellas. Mrs. DiBella, called by the State in rebuttal, testified that neither she nor *335 her husband were injured in the accident, had never filed a claim for damages or retained Perwin as their attorney, were never examined or treated by Mulvaney, and had received no money from the insurance company.
In another case Rose Holder, who was injured in an accident, was sent by her attorney (not Perwin) to be examined by Mulvaney. Mulvaney's medical report and his bill for $600, which were forwarded to the insurance company, indicated Mrs. Holder had sustained a serious back injury, that he had treated her on approximately 45 occasions which included injections and physiotherapy, and had provided her with a lumbosacral belt. On rebuttal Mrs. Holder testified she saw Mulvaney on only one occasion when she was examined by the doctor. She said she had never been treated by Mulvaney and denied receiving any injections or a lumbosacral belt.
Dr. Mulvaney was also cross-examined regarding treatment he gave to Anthony Antico and his infant son Michael for injuries received in a fall and whose claims were settled by the insurance company. Mulvaney's records indicated that Anthony was treated on 16 occasions for injuries to the neck, arm and hip, for which the doctor charged $168. Michael was treated five times and the bill for services was $145. In rebuttal Anthony Antico testified that neither he nor his child was injured in an accident and that he, together with Morelli and Cortese, defrauded the company with the bogus claim. Anthony said he had never been treated by Mulvaney and, in fact, had never met him before the trial.
Yormark was cross-examined about other cases against the insurance company where he represented the claimant and Brizard was the treating physician. One such case involved the settlement of a personal claim by Yormark for injuries he said he sustained in an automobile collision while driving a car. Brizard was his treating physician and submitted a bill for medical services. On rebuttal, Patricia Vroman testified that she was involved in the collision *336 but that Yormark was not the driver of the other vehicle.
Defendants advance three reasons in support of their argument that such testimony was erroneously admitted in evidence. They claim it should have been excluded under Evidence Rule 55, which renders inadmissible evidence of other crimes or civil wrongs to show the disposition of the accused to commit the crime charged; that collateral matters adduced by the State on cross-examination may not be contradicted by extrinsic evidence on rebuttal, and that testimony concerning the Vesper, Lewis and Mozzocca claims was inadmissible because Mulvaney and Perwin had previously been acquitted of criminal conduct involving those claims.
Defendants' reliance on Evidence Rule 55 is misplaced. The rule contains an explicit exception which states that "such evidence is admissible to prove some other fact in issue including motive, intent, plan, knowledge, identity, or absence of mistake or accident." This exception was followed by our courts long before Evidence Rule 55 was adopted. See State v. Sinnott, 24 N.J. 408, 413 (1957); State v. Homer, 86 N.J. Super. 351, 364 (App. Div. 1965). So, too, proof of other instances of misconduct which disclose a working relationship between the parties and a common course of dealing leading up to the crime is admissible. State v. Attanasio, 92 N.J. Super. 267, 269-270 (App. Div. 1966), certif. den. 48 N.J. 354 (1966); State v. Harris, 105 N.J. Super. 319, 322-323 (App. Div. 1969). In our opinion the testimony here complained of was relevant to show knowledge by defendants that the Taylor, McBride and Allison claims were fictitious; the existence of a common scheme or plan to defraud the insurance company, as shown by their prior relationships and course of dealing with each other, and motive and intent to commit the fraud; as well as to expose the falsity of Mulvaney's medical records.
As to defendants' argument that collateral matters developed on cross-examination could not be rebutted by *337 the State, the short answer is that rebuttal testimony can be introduced if it is relevant and would be independently admissible upon a substantive issue in the case. State v. Mathis, 47 N.J. 455, 471 (1966); State v. Schuler, 28 N.J. Super. 275, 277 (App. Div. 1953).
We find no error in the admission of evidence concerning the Vesper, Lewis and Mozzocca claims. The fact that Mulvaney and Perwin had been previously tried and acquitted of other offenses involving such claims does not bar the introduction of evidence with respect to such matters where it is offered for the purpose of showing guilty knowledge, a corrupt intent, and involvement by the defendants in a common scheme or plan to defraud the insurance company in this case. See State v. Robinson, 16 N.J.L. 507, 509 (Sup. Ct. 1838). The admission of such testimony, although it relates to other alleged offenses for which the defendants had been previously acquitted, is upheld by the great weight of authority throughout the country. See Hodges v. State, 85 Ga. App. 617, 70 S.E.2d 48, 50 (Ct. App. 1952), cert. den. 209 Ga. 283, 71 S.E.2d 543 (Sup. Ct. 1952), cert. den. 344 U.S. 903, 73 S.Ct. 283, 97 L.Ed. 698 (1952); People v. Johnston, 328 Mich. 213, 43 N.W.2d 334, 340 (Sup. Ct. 1950); Robinson v. State, 40 Ala. App. 101, 108 So.2d 188 (Ct. App. 1959); People v. Massey, 196 Cal. App. 2d 230, 16 Cal. Rptr. 402, 405 (Ct. App. 1961); Koenigstein v. State, 101 Neb. 229, 162 N.W. 879, 882 (Sup. Ct. 1917); Himmelfarb v. United States, 175 F.2d 924, 941 (9 Cir.1949), cert. den. 338 U.S. 860, 70 S.Ct. 103, 94 L.Ed. 527 (1949); United States v. Feinberg, 383 F.2d 60, 71 (2 Cir.1967), cert. den. 389 U.S. 1044, 88 S.Ct. 788, 19 L.Ed.2d 836 (1968).
Defendants rely primarily on State v. Bartell, 15 N.J. Super. 450 (App. Div. 1951), which was affirmed by an evenly divided court thereby rendering any opinion by the court impossible. 10 N.J. 9 (1952). We conclude that Bartell is inapposite. The court there held, in a prosecution for procuring illegal registration of voters, cross-examination *338 of defendant concerning registration of other unqualified voters, with respect to which defendant had already been exonerated of unlawful intent and the charges predicated thereon dismissed, was not relevant to the issues and could not be pursued as a matter of right, and further, that permitting such cross-examination for the purpose of testing the defendant's credibility on collateral subjects was erroneous where such proof at most could only generate a speculative inference that he had a propensity to commit the crime charged. However, it is noted that the court specifically excluded from its ruling all questions calculated to establish the criminal motive of the defendant.
We are satisfied that the challenged testimony in the instant case was relevant and properly admitted by the trial judge for the reasons we have previously expressed.

IV
We turn next to Dr. Mulvaney's claim that he was deprived of his Sixth Amendment right to the assistance of counsel. The claim is predicated upon the court's appointment of Dino Bliablias as Mulvaney's attorney when Frederic Ritger, his trial attorney, was hospitalized with a suspected heart attack during the tenth week of the trial. The record shows that on November 16, 1970, Walter Van Riper advised the court that Ritger, his law partner, had suffered chest pains and been taken to a hospital. The trial court requested Van Riper to act temporarily for Mulvaney until the seriousness of Ritger's condition could be ascertained, and said that if Ritger would be unable to return, a decision would have to be made as to whether Van Riper would be required to review the transcript and continue the trial rather than declare a mistrial as to Mulvaney. Van Riper replied that he would be unable to do so because of the other trial commitments. On the following day Van Riper informed the court that Ritger was "suspected of having a coronary" and it would be ten days before the doctor could *339 determine whether Ritger would be able to resume with the trial. Van Riper moved for a severance on behalf of Mulvaney which was opposed by the prosecutor who said that a state physician was then examining Ritger. The motion for a severance was denied.
On Wednesday, the next day, Ritger's physician expressed an opinion that Ritger suffered from a pulmonary embolism and would require hospitalization for three to five weeks. The prosecutor reported that the State's physician confirmed that Ritger's condition was serious and that the optimum time for recovery would be about two weeks. The prosecutor opposed granting a severance as to Mulvaney because ten weeks of trial had elapsed and suggested that Van Riper or some other attorney act for Mulvaney following a reasonable continuance for counsel to prepare his case. Van Riper iterated that he could not take over the case because of other commitments. At the end of the court session that day the trial court again denied the motion for a severance, ordered Mulvaney to engage new counsel, and stated that if he could not do so the court would assign counsel to represent him. Van Riper asked for a recess until the following Monday for this purpose but the court ruled that Mulvaney would have until noon the next day to engage counsel.
That evening Mulvaney conferred with Bliablias concerning his representation in the case. On the following day Van Riper, on behalf of Mulvaney, made an unsuccessful application to this court for a stay of the trial court's ruling. Mulvaney thereupon requested that he be granted more time to retain an attorney of his own choice. The trial judge denied the request, indicating his belief that Mulvaney was engaging in dilatory tactics and feigning inability to get a lawyer. The judge then appointed Bliablias to serve as Mulvaney's trial counsel. An 11-day recess was granted in order for Bliablias to familiarize himself with the case, which period was subsequently extended for an additional day. Thereafter Bliablias served as Mulvaney's trial counsel for the next seven weeks and to the conclusion of the trial.
*340 Mulvaney argues that he (1) was not afforded a fair opportunity to secure counsel of his own choice, and (2) was denied the effective assistance of counsel. It is firmly established that one accused of crime has the right to the assistance of counsel for his defense, Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799, (1963), and also has the right to "a fair opportunity to secure counsel of his own choice." Crooker v. California, 357 U.S. 433, 439, 78 S.Ct. 1287, 1291, 2 L.Ed.2d 1448 (1958). However, the right to choose counsel of his own choice is not an absolute right; reasonable diligence in securing counsel is required. State v. Longo, 133 N.J.L. 301 (E. & A. 1945). An accused's right to select his own counsel cannot be insisted upon in a manner that will obstruct an orderly procedure in our courts. Thus, if an accused does not act expeditiously in securing counsel, the trial court may, in the exercise of its sound discretion do what is reasonably necessary to meet the situation. Releford v. United States, 288 F.2d 298, 301 (9 Cir.1961).
Ten weeks of trial had already elapsed when the court was informed of Ritger's illness. The State, Perwin, Mulvaney, and Brizard had completed presentation of their cases in chief. Yormark had completed his direct examination, had been cross-examined by counsel for Perwin, Mulvaney and Brizard, and was undergoing cross-examination by the prosecutor. Although Mulvaney learned that Ritger was incapacitated on November 16, it is apparent that he did nothing with regard to obtaining a new attorney until the court directed that he do so on November 18. Thereafter he conferred with Bliablias, who is conceded to be an able trial lawyer experienced in the trial of criminal cases. While we think the trial court should have granted Van Riper's request to allow Mulvaney until the following Monday to attempt to secure counsel, we are satisfied that the court's refusal to do so does not constitute reversible error. It is apparent that during the 12-day recess following Bliablias' appointment Mulvaney took no steps to secure *341 counsel of his own choice, an avenue which was open to him if he believed Bliablias would not afford him proper representation. We are satisfied that Mulvaney's constitutional right to the assistance of counsel was not violated; that he was not precluded from a fair opportunity to retain counsel of his own choice if he had so desired, and that under the circumstances presented the trial court did not abuse its discretion in appointing counsel.
We find no merit in Mulvaney's claim that he was denied the effective assistance of counsel. To warrant the reversal of a criminal conviction on the ground of inadequate legal representation there must be a showing that the defendant was prejudiced thereby  that the representation by counsel was such as to make the trial a farce and a mockery of justice. State v. Bentley, 46 N.J. Super. 193, 203 (App. Div. 1957); and see State v. Dennis, 43 N.J. 418, 426-429 (1964); State v. Wade, 89 N.J. Super. 139, 143 (App. Div. 1965); State v. Woodard, 102 N.J. Super. 419, 429 (App. Div. 1968), certif. den. 53 N.J. 64 (1968), cert. den. 395 U.S. 938, 89 S.Ct. 2004, 23 L.Ed.2d 453 (1969). We have carefully reviewed the record and are convinced that Bliablias rendered able and efficient representation on behalf of Mulvaney. The record demonstrates that he had a knowledge of the facts developed both before and after his appointment and effectively presented the case in defense of his assigned client.
Mulvaney's further contention that he was deprived of his constitutional right to confront witnesses presented against him because he was represented by counsel who was inadequately prepared to assist him is clearly frivolous. His reliance on Pointer v. Texas, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965) is misplaced.

V
After the conclusion of testimony and during summations the trial judge was informed by George Wilson, one of the 16 jurors selected to hear the case, that his wife had been *342 approached by a Dr. Brown to speak to the juror on behalf of Mulvaney. A Dr. Brown had previously testified as a character witness for that defendant. The trial judge conducted a hearing, out of the presence of the other members of the jury, during which Wilson related in detail how Brown had spoken to his wife at the hospital where she was employed and sought to have her influence her husband on Mulvaney's behalf, and further, how Brown had attempted to talk to the juror by telephone. Upon being questioned by the judge, Wilson said that if he were selected to serve on the jury which would decide the case, he could base his decision entirely on the evidence and render a fair and honest verdict without the incident influencing his decision. Defendants' motions to exclude Wilson as a member of the jury were denied, as were motions for a mistrial.
Defendants claim that their rights to a fair and impartial jury were violated because Wilson was permitted to serve on the jury. They argue that the attempt by Brown to influence the juror had the capacity to influence the verdict notwithstanding the juror's statement that it would have no such effect.
A trial judge is vested with broad discretionary powers in deciding whether a juror should be excluded because of a wrongful attempt to influence his decision. Here the juror's responses to the judge's questioning indicated affirmatively that Brown's improper act would not influence him in arriving at a verdict. We conclude that the judge's refusal to remove the juror or to grant a mistrial was a proper exercise of discretion. Cf. State v. Boiardo, 111 N.J. Super. 219 (App. Div. 1970), certif. den. 57 N.J. 130 (1970), cert. den. 400 U.S. 859, 91 S.Ct. 13, 27 L.Ed.2d 98 (1970).

VI
The remaining points urged by defendants as grounds for a reversal can be disposed of summarily with little comment. Motions for acquittal made by Mulvaney *343 and Brizard were properly denied by the court. The evidence produced by the State, together with all logical inferences which could be drawn therefrom, was sufficient for a jury to find defendants guilty of the charge of conspiracy beyond a reasonable doubt. State v. Reyes, 50 N.J. 454, 458-459 (1967). Mulvaney's motion for a new trial on the ground that the verdict was contrary to the weight of the evidence was also properly denied. R. 3:20-1 provides that the trial judge shall not set aside the verdict of the jury as against the weight of the evidence unless, having given due regard to the opportunity of the jury to pass upon the credibility of the witnesses, it clearly and convincingly appears that there was a manifest denial of justice under the law. A review of the record convinces us that the proofs would not have justified such a finding by the trial court.
Perwin, Mulvaney and Yormark contend that their sentences were manifestly excessive and based on improper and unconstitutional policy considerations on the part of the trial judge. They claim they were penalized for their refusals to admit guilt at the sentencing hearing. We find no illegality in the views expressed by the judge during the hearing. There was no threat of an increase in sentence if defendants refused to admit their guilt. Quite to the contrary, the record indicates that after a consideration of the backgrounds of the respective defendants, the judge said he would not impose the maximum prison terms permitted by law and instead sentenced them to lesser terms in the county penitentiary. The rule is well settled that the quantum of the sentence imposed, if within the limits fixed by law, rests within the sound discretion of the trial judge. The burden of establishing that the sentence was excessive rests upon a defendant, and he may succeed in his contention only where it clearly appears that the judge abused his judicial discretion. State v. Cox, 101 N.J. Super. 470, 475 (App. Div. 1968), certif. den. 53 N.J. 510 (1969). We have reviewed the sentences imposed in the light of the total circumstances and conclude that *344 there was no abuse of judicial discretion, and the sentences were not excessive.
We also find no substance in Mulvaney's charge that the trial judge erred in ordering that he pay one-fourth of the costs of the prosecution of the trial. N.J.S.A. 2A:168-2 explicitly provides that the costs of prosecution may be imposed as a condition of probation.
We have considered the other points raised by the defendants: that improper conduct by the trial court denied them the right to a fair trial; that the court unduly restricted their cross-examination of witnesses; that an accumulation of trial errors requires a reversal; that Morelli was permitted to testify although pages of a prosecutor's notes of a pretrial interview of Morelli were lost or misplaced and could not be produced for use on cross-examination of the witness; that production of Perwin's office files before the grand jury by his partner Dvorin in response to a subpoena duces tecum violated Perwin's Fourth and Fifth Amendment rights; that the court's charge was erroneous, and that Brizard was prejudiced by unfair comments by the prosecutor in summation. We find that none of these points has merit.
The judgments of conviction are affirmed.