967 A.2d 898 (2009)
406 N.J. Super. 332
STATE of New Jersey, Plaintiff-Respondent,
v.
Duane KELLY, a/k/a Dwayne A. Kelly, Defendant-Appellant.
DOCKET NO. A-3199-05T4.
Superior Court of New Jersey, Appellate Division.
Argued January 6, 2009.
Decided April 6, 2009.
*901 Jay L. Wilensky, Assistant Deputy Public Defender, argued the cause for appellant (Yvonne Smith Segars, Public Defender, attorney; Mr. Wilensky, of counsel and on the brief).
Joie Piderit, Deputy Attorney General, argued the cause for respondent (Anne Milgram, Attorney General, attorney; Ms. Piderit, of counsel and on the brief).
Before Judges WEFING, PARKER and YANNOTTI.
The opinion of the court was delivered by
WEFING, P.J.A.D.
A jury convicted defendant of two counts of murder, N.J.S.A. 2C:11-3(a)(1); two counts of felony murder, N.J.S.A. 2C:11-3(a)(3); and one count of first-degree robbery, N.J.S.A. 2C:15-1. The trial court merged the robbery and felony murder convictions into the convictions for murder and sentenced defendant to two consecutive life terms, each with a thirty-year period of parole ineligibility. Defendant has appealed his convictions and sentence. After reviewing the record in light of the contentions advanced on appeal, we affirm.

I
The matter has a complex factual and procedural background which must be set forth to properly analyze defendant's contentions on appeal.
Defendant was convicted of killing 24-year-old Rajauhn Anderson and 21-year-old Malcolm Mills on the evening of June 15, 2001. Anderson maintained a business selling marijuana and hallucinogenic mushrooms from his apartment located at 327 Watson Avenue in Plainfield. Charles Knight went to the apartment in the late afternoon of June 15 to purchase some marijuana, and defendant answered the door and let him in. Derrick Davis and Mills arrived some time later.
Davis testified that Anderson opened a kitchen drawer and took out what appeared to be a gun wrapped in a scarf and took it upstairs. Davis said that he did not go upstairs because Anderson insisted that anyone doing so take off his shoes and Davis did not wish to do so.
Knight, however, did remove his shoes and go upstairs with Anderson, as did Mills and defendant. Knight testified that when the four men were upstairs, Anderson displayed a .38 caliber silver revolver *902 that he kept wrapped in a scarf. Knight also testified that Anderson took a box out of a closet and showed the men a black, semiautomatic handgun that had been in the box. Anderson passed it around but would not permit defendant to handle the weapon. Anderson returned the gun to the box and placed the box back in the closet.
There was additional testimony about Anderson keeping guns in the house. His next door neighbor, Yusef Greene, testified that Anderson kept a .38 caliber chrome revolver wrapped in a scarf and had a .40 caliber semiautomatic handgun that he kept in a box.
After Anderson showed these guns, he, Mills and Knight decided to get something to eat and Knight drove the men to a nearby health food store. Davis left the house at the same time but he did not go with the other three men. Defendant remained behind in the house.
Knight testified that he, Anderson and Mills were away for about thirty or forty minutes. When they had finished eating their food, Knight drove them back to Anderson's home. Anderson and Mills got out of the car and walked into the house. Knight remained in the car, expecting them to come back, because they had asked for a ride to the barbershop. Knight waited in the car for twenty to thirty minutes and then went and knocked on the door and rang the bell but no one answered. He also called Anderson on his cell phone, but there was no answer. A review of Anderson's cell phone records placed this call at 5:57 p.m. Knight waited a few more minutes and then drove off.
Jeffrey Goodman was a friend of the defendant. He testified that he was working at the South Avenue Car Wash in Plainfield on June 15 when he saw defendant walking by quickly, carrying a book bag. Goodman could not place the time but knew that it was still light. He said that defendant was sweating and looking behind him. Goodman spoke to defendant, but he testified defendant just waved back and continued walking quickly, not stopping to talk.
At approximately 6:00 p.m. on June 15, Anthony Sapienza drove his Ford pick-up truck to Little Italy Pizza in Fanwood. He parked his truck and went in to pick up his pizza but left his keys in the truck. When he returned, the truck was gone. He reported the theft and the truck's license plate number. There was testimony that it was a ten-minute walk from Anderson's home in Plainfield to the pizza place in Fanwood.
At approximately 6:30 p.m. Patrolman Alejandro Yanes of the Clark Police Department, who had received a broadcast about the stolen truck, saw defendant driving that truck. Yanes testified that defendant looked in his direction, saw the patrol car, sped up, crossed double yellow lines and turned left. Yanes turned on his lights and siren and followed him. Yanes said the pursuit went through residential areas (at one point through several back yards) and streets with heavy traffic, that defendant's speed went up to sixty miles per hour and that he went through stop signs without stopping. Eventually the front passenger tire on the truck blew out and the truck hit a parked car, a light post, and then a tree.
Defendant leapt out of the truck and began to run, with the police in pursuit. Defendant ran toward a reservoir, jumped in and went out approximately twenty feet from the shore. He eventually responded to repeated commands to come out of the water and was handcuffed. Defendant was bleeding from his head, and the first aid squad was summoned to assist him.
*903 Patrolman Steven Francisco of the Clark Police Department assisted Yanes in apprehending defendant. Francisco secured the scene and retrieved the following items:
1. a .40 caliber High Point semiautomatic handgun that had been wedged between the dashboard and the windshield of the truck;
2. a black knapsack which contained eight bags of marijuana, weighing .78 pounds, large and small plastic bags and a scale;
3. a magazine containing live ammunitionfive.40 caliber full metal jacket roundsfrom the front passenger floor; and
4. a box of .40 caliber metal jacket rounds.
Sapienza, the truck's owner, did not own any guns, and he did not keep any guns, drugs or scales in his truck. After the truck was returned to him, he found a box for a High Point .40 caliber handgun, and he turned it over to the police.
Defendant was placed under arrest and charged with burglary, theft, possession of a controlled dangerous substance with intent to distribute within 500 feet of a public facility, eluding, resisting arrest, possession of a weapon in the course of a drug crime, and certain persons not to have weapons.
The day after defendant was arrested, Patrolman Yanes saw him in the Clark jail and inquired how he was doing. Yanes told him he would probably face ten years in jail based on the events of the day before. Yanes testified that defendant responded no, that he was going away for life. Yanes did not understand this response.
Two days later, on June 17, Leslie Pennington, an aunt of Mills, went to Anderson's house looking for Mills. She was accompanied by his brother, father and his brother's fianceé Knocks on the door received no response. The front door was locked. Pennington went to the rear and tried the back door, which was not locked. She entered the house and heard music playing loudly. Upstairs, she found the bodies of Anderson and Mills, each of whom had been shot to death.
Police and emergency personnel responded to the scene. Their search of the house did not turn up either the .38 caliber revolver or the .40 caliber semiautomatic handgun that Anderson had shown to defendant, Mills, and Knight on June 15.
The medical examiner could not estimate a precise time of death but testified that both men were shot at the same time, which he estimated to be from 36 to 48 hours before their bodies were discovered. Bullets were retrieved during the autopsies.
Based upon their investigation, defendant, who was in custody for the incidents which occurred in Clark, was also charged in connection with the killings of Anderson and Mills. Ballistic testing determined that those bullets recovered at the autopsies were not fired from the .40 caliber semiautomatic handgun that had been recovered when defendant was arrested.
The homicide matter was tried first. By the time of that trial, the murder weapon had still not been recovered. A jury convicted defendant of the murder of Anderson and Mills, felony murder of Anderson and Mills, robbery of Anderson while armed, and possession of a .40 caliber handgun without a permit. The jury found defendant not guilty of possession of the .38 caliber handgun without a permit and not guilty of possessing that gun with the intent to use it unlawfully. He was also found not guilty of possession of the *904 .40 caliber handgun with intent to use it unlawfully.
Defendant appeared for sentencing on December 12, 2003. The trial court merged the felony murder convictions into the murder convictions and sentenced defendant to two consecutive life terms, each with a thirty-year period of parole ineligibility. It also sentenced defendant to a concurrent twenty years for robbery and five years for unlawful possession of a weapon.
Approximately three months later, the trial court conducted a hearing at which it determined that defendant's convictions flowing from this trial had to be set aside. During defendant's trial he had presented one defense witness, Shelley Copeland Perrey. Ms. Perrey testified that on June 23, 2001, she had been with Terrence Wilson (whom she referred to as "T") and George Pennant (whom she referred to as "G"). She said the three had been walking to buy marijuana and Wilson asked her to go away with him, saying "he had gotten himself into a situation," that he had a lot of money and could take care of her. She continued that they went to a house to smoke the marijuana and Wilson and Pennant got into an argument, Wilson saying that if Pennant had done his job, Wilson would not have to leave town. She said that Wilson asked her if she had heard about the two young men who had been shot, and she said yes. She said that Wilson then told her that a woman he knew had asked him to rob "her man" and that he and Pennant went to Anderson's house. He said that while the robbery was in progress, Pennant let someone enter the house and that person pulled off the mask Wilson had been wearing and that, as a result, "they had to do them," meaning kill Anderson and Mills.
Perrey had supplied a statement to the police to this effect during their investigation and, based upon that statement, defendant and Wilson were indicted as co-defendants, but their trials were severed, with defendant being tried first. After defendant was convicted and sentenced, but before Wilson's trial commenced, Perrey wrote a letter to the prosecutor's office and the trial court, stating she did not want to testify at Wilson's trial because she did not want to be untruthful. The prosecutor's office then interviewed Perrey and determined that her story about this conversation was not true. Because the prosecution's case against Wilson was premised upon her testimony, it dropped all charges against him.
Based upon this presentation, the trial court sua sponte concluded that defendant's convictions for murder, felony murder and robbery had to be vacated because false testimony had been presented. The prosecution did not oppose that determination, although it was the defense which had presented the false testimony.[1] Neither did the prosecution seek leave to appeal from that ruling. The trial court concluded that the false testimony tainted the convictions for murder, felony murder and robbery and set them aside. Defendant had, in the interim, been tried on the charges coming out of Clark and had been convicted on all counts. The trial court concluded that the tainted testimony did not affect those convictions.
The month after the trial court vacated these convictions, the murder weapon, *905 which had not been available at the first trial, was recovered at 326 Leland Avenue in Plainfield. This property abutted the rear of 327 Watson Avenue. Roy Stange purchased the building at 326 Leland and hired a crew to clean up the grounds, which had been neglected and were overgrown. One of the work crew found a handgun, which he gave to his foreman who, in turn, gave it to Stange. Stange delivered it to the police. It was a .38 caliber Smith and Wesson revolver that was dirty and rusted. The cylinder contained three spent shells and three whole cartridges. Ballistics testing determined that the bullets that killed Anderson and Mills had been fired from this gun.
Prior to defendant's second trial getting under way, the trial court ruled that the State could only proceed against defendant on the retrial on the theory that defendant was the shooter. The trial court noted that at the first trial, the State had proceeded both on the theory that defendant was the shooter and on the theory of accomplice liability. According to the trial court, the only evidence supporting a theory of accomplice liability was that of the discredited witness Perrey. Absent that evidence, the trial court ruled, the State was restricted to attempting to prove that defendant committed the murders himself.
At defendant's second trial, he was again convicted of the murders of Anderson and Mills, of felony murder and of robbery. He was not tried on the weapons charges for which he had been acquitted at the first trial. The trial court sentenced defendant as it had after the first trial and this appeal followed.
Defendant raises the following arguments on appeal:
POINT I THE INSTANT PROSECUTION AS TO MURDER IS PRECLUDED BY THE DOCTRINE OF COLLATERAL ESTOPPEL. ACCORDINGLY, THE CONVICTION MUST BE VACATED AND THE INDICTMENT DISMISSED. U.S. CONST. AMEND. V, XIV; N.J. CONST. (1947) Art. 1, Par. 11.
POINT II THE DEFENDANT'S RIGHT AGAINST DOUBLE JEOPARDY WAS ALSO VIOLATED BY THE STATE'S REFINEMENT OF ITS CASE DURING THE RETRIAL. U.S. CONST. AMEND. V, XIV; N.J. CONST. (1947) Art. 1, Par. 11 (Not Raised Below).
POINT III THE STATE COMMITTED HIGHLY PREJUDICIAL MISCONDUCT BY DENIGRATING THE DEFENSE AND MAKING ERRONEOUS FACTUAL ASSERTIONS IN SUMMATION, NECESSITATING REVERSAL. U.S. CONST., AMENDS. VI, XIV; N.J. CONST. (1947), ART. 1, PARS. 9, 10. (Not Raised Below).
POINT IV THE TRIAL COURT'S PRETRIAL INSTRUCTION AS TO CIRCUMSTANTIAL EVIDENCE WAS HIGHLY PREJUDICIAL, NECESSITATING REVERSAL. (Not Raised Below).
POINT V THE TRIAL COURT ERRED IN IMPOSING CONSECUTIVE SENTENCES.

II
Defendant's first argument is premised upon the fact that the first jury which heard the matter acquitted defendant of possession of the .38 caliber murder weapon. Having been found not guilty of that offense, defendant contends, he could not be found guilty of committing a murder with that gun.
Under the doctrine of collateral estoppel, a matter that has actually been litigated and determined cannot be re-litigated. In its original formulation, the doctrine *906 applied only to proceedings between the same parties. State v. Cormier, 46 N.J. 494, 505, 218 A.2d 138 (1966). New Jersey no longer adheres to the requirement of mutuality of parties for the application of collateral estoppel. State v. Gonzalez, 75 N.J. 181, 380 A.2d 1128 (1977) (holding that the State, having lost a motion to suppress brought by a co-defendant, was not entitled to re-litigate that issue, on the same facts, with respect to defendant).
The constitutional guarantee of double jeopardy bars the State from subjecting a defendant to the hazards of a trial and possible conviction more than once for the same alleged offense. The rule of collateral estoppel directs that once an issue of ultimate fact has been litigated and determined by a valid and final judgment, the issue cannot again be relitigated in a subsequent proceeding between the same parties.
[State v. Yormark, 117 N.J.Super. 315, 333, 284 A.2d 549 (App.Div.1971), certif. denied, 60 N.J. 138, 286 A.2d 511, cert. denied, Perwin v. N.J., 409 U.S. 862, 93 S.Ct. 151, 34 L.Ed.2d 109 (1972).]
We have recently summarized the current formulation of the principle of collateral estoppel.
[I]n order for collateral estoppel to foreclose re-litigation of an issue, the party asserting the bar must show that five elements exist:
"(1) the issue to be precluded is identical to the issue decided in the prior proceeding; (2) the issue was actually litigated in the prior proceeding; (3) the court in the prior proceeding issued a final judgment on the merits; (4) the determination of the issue was essential to the prior judgment; and (5) the party against whom the doctrine is asserted was a party to or in privity with a party to the earlier proceeding."
[State v. Brown, 394 N.J.Super. 492, 502, 927 A.2d 569 (App.Div.2007) (citation omitted) (holding that collateral estoppel did not preclude defendant's indictment for sexual assault, criminal sexual assault and aggravated assault after the Family Part denied a final restraining order to the complainant after a full hearing, finding the incident consensual).]
As we noted in Brown, analysis of a claim of collateral estoppel may differ in a civil context from that in a criminal context because account must be taken of a defendant's Fifth Amendment rights, and "[c]ivil and criminal proceedings involve different values." Ibid.
The United States Supreme Court has instructed that when considering whether a subsequent prosecution is barred by collateral estoppel, a court must be practical, realistic and rational. Ashe v. Swenson, 397 U.S. 436, 444, 90 S.Ct. 1189, 1194, 25 L.Ed.2d 469, 475-76 (1970) (holding that a defendant acquitted of robbing three individuals could not later be tried for robbing the fourth member of the group, identity being the critical issue).
Where a previous judgment of acquittal was based upon a general verdict, as is usually the case, this approach requires a court to "examine the record of a prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration."
[Ibid. (citation omitted).]
Having reviewed this record, we are satisfied that defendant is not entitled to relief under the principles of collateral estoppel. We reach this conclusion for several reasons.
*907 The trial court interpreted the jury's verdict in the first trial acquitting defendant of possession of the .38 caliber gun as a finding that defendant was guilty as an accomplice, and it was on that basis that it restricted the State, at the second trial, to a theory that defendant was the shooter.
We do not agree that the jury's verdict in that first trial was necessarily premised on a theory of accomplice liability. Our Supreme Court has commented, albeit in a different context, that courts "should not speculate as to whether the verdicts resulted from jury lenity, compromise, or mistake not adversely affecting the defendant." State v. Grey, 147 N.J. 4, 11, 685 A.2d 923 (1996). We have no way of knowing what led the first jury to acquit defendant of possession of the .38 caliber weapon and possession of that weapon for an unlawful purpose. We do not know if that jury, for some reason, determined simply that it had found defendant guilty of a sufficient number of crimes. We do not know if that jury concluded that defendant could not be guilty of possessing that weapon because it had not been recovered and produced at his trial.
Further, we cannot disregard the fact that the verdicts reached at defendant's first trial were set aside on the basis of perjured testimony that was presented on the defense side. Although we recognize that no evidence was presented linking either defendant or his then-attorney to the production of this perjured testimony, it is repugnant to fundamental justice to let defendant reap an advantage from it.
Additionally, even accepting the trial court's conclusion that the jury verdicts at the first trial were tainted by the perjured testimony, we cannot analytically distinguish between the verdicts finding defendant guilty and those finding him not guilty. If one verdict is to be considered tainted by that testimony, then all should be. Defendant should not be allowed to pick and choose among those verdicts, using a tainted acquittal verdict to shield him from a trial free from perjurious testimony.
It is clear, of course, that fundamental principles of double jeopardy precluded the State from trying defendant again on those offenses for which he was acquitted. Defendant is not entitled to stand behind those acquittals, however, to avoid a retrial on separate offenses.
When defendant presented his argument below, the trial court rejected it, relying on Santamaria v. Horsley, 133 F.3d 1242 (9th Cir.), cert. denied, 525 U.S. 823, 119 S.Ct. 68, 142 L.Ed.2d 53 (1998). We agree with the trial court's analysis and conclusion that Santamaria is closely analogous to the situation before us.
The defendant in that case was convicted by a jury of murder and robbery. Id. at 1244. As part of its deliberations, the jury was asked to answer the question whether he had personally used a knife in committing the offenses; the question bore upon the nature of the sentence the defendant would receive. To this question the jury answered "not true." Ibid. Defendant's conviction was reversed for an error that occurred during jury deliberations, and Santamaria contended that he could not be tried again for murder and robbery in light of the jury's response to the question whether he had used the knife. The matter came before the Court of Appeals on an appeal in a habeas corpus petition. The court concluded that the State was not barred from contending at a second trial that Santamaria personally stabbed the victim, as opposed to acting as an accomplice to another. Id. at 1247. It reached this determination because it was satisfied that use of the knife was not "an ultimate fact for the purposes of a murder *908 conviction...." Ibid. It noted that "an acquittal is not a finding of any fact. An acquittal can only be an acknowledgment that the government failed to prove an essential element of the offense beyond a reasonable doubt." Id. at 1246 (quoting United States v. Watts, 519 U.S. 148, 155, 117 S.Ct. 633, 637, 136 L.Ed.2d 554, 564 (1997)).
Defendant concedes that the reasoning and analysis in Santamaria would authorize his retrial for murder, felony murder and robbery but urges that we should not adopt it. He points to our Supreme Court's willingness to interpret our own constitution to afford greater rights than the United States Constitution. State v. Hempele, 120 N.J. 182, 196, 576 A.2d 793 (1990). In our judgment, neither logic nor policy would call for such a departure here. We are satisfied that the trial court correctly ruled that defendant's second trial was not barred by collateral estoppel.

III
Defendant's second argument on appeal is that the prosecution violated his right against double jeopardy by refining and upgrading the evidence it presented against him at the second trial. He points to two specific areas of proof.
At defendant's first trial, the State presented Jeffrey Schell, who also worked at the car wash. Schell testified that he saw defendant walking quickly past the car wash, carrying a book bag. Schell said he noticed nothing unusual about defendant.
At defendant's second trial, Schell did not testify. Instead, the State presented Jeffrey Goodman, whose testimony, with its references to defendant sweating and looking behind him, we summarized earlier in this opinion.
In addition, the State presented as a witness at the second trial, Kenya Mutyanda, who did not appear at the first trial. She was a cousin to Anderson and a friend of defendant. At the time of the murders, Mutyanda was living in California and she said that defendant would call her regularly to talk, even on a daily basis. He would talk to her about his problems in getting his life on track. He told her that he was grateful to Anderson, who was helping him and giving him money, but that he wanted to finish school and get a job and stand on his own. Mutyanda said that defendant told her he felt like Anderson's "bitch." Mutyanda testified that she heard from defendant approximately a week before she learned of the killings, and then did not hear from him for several weeks. She became concerned and tried several times to reach him by phone but had no success. When she learned of Anderson's death, she came to New Jersey for several days but then returned to California.
She testified that on July 9, 2001, she received a telephone call from defendant, who told her that he was in jail. He related to her the events in Clark and Fanwood that led to his arrest. Mutyanda asked about the killings, and defendant told her he had no involvement with them and had not been arrested for them. He went on, however, to tell her that he had been in the house at the time the murders were committed. Mutyanda testified that defendant told her that he had been in the basement using the toilet when he heard Anderson return from his meal. He heard footsteps going to the second floor. Defendant told her that he was coming up the stairs from the basement when he heard gunshots fired, and he froze on the basement stairs. He then heard footsteps coming from the second floor and another pair of footsteps running. He waited until it was silent before coming up out of the basement. Mutyanda testified that defendant told her he then went to the second *909 floor and found the bodies of Anderson and Mills. She said that she asked if he checked whether the men were alive or called 9-1-1, and defendant said he was "out of it" and did not do so. She became angry with him for not calling for help but taking the gun and drugs.
Mutyanda also testified that when she returned to New Jersey for Anderson's funeral, she and Anderson's mother went to the apartment at 327 Watson Avenue to get his belongings and clean the apartment. She said that while there, she went down to the basement and saw the toilet. She said it was dirty and there was no water in the bowl.
Mutyanda returned to New Jersey again approximately ten days after speaking to defendant. She contacted the Plainfield police department to advise them of this conversation. During cross-examination she was confronted with the fact that she gave two statements in connection with this conversation. The first, in July 2001, did not mention the condition of the basement toilet. The second, in October 2003, did mention it.
Mutyanda's testimony about the condition of the downstairs bathroom was corroborated by the testimony of Plainfield Police Officer Jean Calvin who responded to 327 Watson Avenue to direct the investigation after the discovery of the bodies. He testified that he entered the basement and found it dusty and filled with cobwebs. He said the toilet bowl was "bone dry." He did not enter that information in his reports until after Mutyanda reported her conversation with defendant.
Defendant argues that presenting these additional witnesses, which had the effect of strengthening the State's case against him, was impermissible as a violation of double jeopardy. There is no merit to this argument.
We note first that the case upon which defendant builds his argument, Grady v. Corbin, 495 U.S. 508, 110 S.Ct. 2084, 109 L.Ed.2d. 548 (1990), has been overruled. United States v. Dixon, 509 U.S. 688, 113 S.Ct. 2849, 125 L.Ed.2d 556 (1993). More fundamentally, this is not an instance of the State pursuing serial prosecutions in an attempt to refine its proofs. The second trial resulted because of misconduct by a defense witness. We know of no authority which would mandate the prosecution, in a matter such as this, to go no further with its evidence than it had at the first trial. Nor can we perceive any reason why such a restriction should be imposed in this context.

IV
In defendant's next argument, he contends that prejudicial remarks by the prosecutor in his closing argument mandate a reversal of his convictions. Defendant made no objection to those remarks at the time they were made but now contends the prosecutor's summation so denigrated defense counsel and misstated the record that it satisfies the standard of plain error. R. 2:10-2.
A prosecutor in summation is limited to comment on the evidence and the inferences that could reasonably be drawn from the evidence. State v. Feaster, 156 N.J. 1, 59, 716 A.2d 395 (1998). A prosecutor may not intentionally mislead the jury about the evidence and the inferences it may support. Ibid. The "prosecutor's primary obligation is not to win convictions but to see that justice is done." Ibid.
"[P]rosecutorial misconduct is not grounds for reversal of a criminal conviction unless the conduct was so egregious as to deprive defendant of a fair trial." State v. Timmendequas, 161 N.J. *910 515, 575, 737 A.2d 55 (1999), cert. denied, 534 U.S. 858, 122 S.Ct. 136, 151 L.Ed.2d 89 (2001). "[T]he tenor of the trial and the responsiveness of counsel and the court" must be considered in reaching a decision on such a claim. Ibid.
If counsel did not object to the allegedly improper remarks, they generally "will not be deemed prejudicial. The failure to object suggests that defense counsel did not believe the remarks were prejudicial at the time they were made. The failure to object also deprives the court of an opportunity to take curative action." State v. Frost, 158 N.J. 76, 83-84, 727 A.2d 1 (1999) (citation omitted).
We have reviewed the summations of both counsel and find nothing which would warrant a reversal of these convictions. The prosecutor's remarks to which defendant now objects did not disparage defendant or his attorney personally. The prosecutor responded to defense counsel's arguments that the prosecution's case left many unanswered questions by contending that the areas commented on were fundamentally not important to the overall picture. The cases upon which defendant relies, State v. Negron, 355 N.J.Super. 556, 576, 810 A.2d 1152 (App.Div.2002), and State v. Acker, 265 N.J.Super. 351, 354-58, 627 A.2d 170 (App.Div.), certif. denied, 134 N.J. 485, 634 A.2d 530 (1993), are distinguishable.
When Knight testified about seeing the .38 caliber revolver on June 15, he said that the cylinder contained both .38 caliber and .357 caliber shells. When the weapon was finally recovered, it held three spent.38 caliber shells and two loaded .38 caliber shells. There was expert testimony that although a .357 caliber shell would fit into the cylinder of a .38 caliber revolver, the cylinder would not close because a .357 caliber shell is too long.
Defense counsel in her summation pointed to Knight's testimony to argue that the weapon found on the Leland Avenue property might not be the murder weapon. The prosecutor responded in the following manner:
You heard [defense counsel] say that [Knight] said he saw the .357 shells on June [15th]. That's not what he said. He said there was a time when he saw.357 shells in it, in and out. [Knight] is not a gun expert.
Defendant is correct when he contends that this remark does not accurately state the record. Knight clearly testified he saw the two different shells in the gun on June 15. This inaccuracy does not justify reversing defendant's conviction, however, for it does not involve a crucially significant fact, and the trial court correctly instructed the jury that it must rely on its own recollection of the testimony and not what either of the attorneys represented it to be.

V
Defendant's next argument is that the trial court committed prejudicial error in its initial remarks to the jury, when it explained to the jury the distinction between direct and circumstantial evidence. The trial court did not use the classic illustration of actually witnessing a snowfall and going to bed at night and awakening to find the ground covered with snow in the morning. Instead, it gave the following example.
Let's assume that you have a talent like my wife and she can make a very good apple pie. So today you have made an apple pie and it's on your kitchen table. And it's either your son or nephew comes over and he's hungry because it's 4:00 o'clock. He's hungry like a lion because he's 16 years of age. With your eyes you see him cut the cake or pie *911 and eat it. That would be direct evidence of the fact he cut and eat [sic] it.
If you left him in the room by himself for 10 minutes, nobody else went in, nobody else went out [sic]. When you went in it was a circular pie that was perfect, pristine. When you go in there's a large chunk out of it. Doesn't take a genius to conclude that he cut the cake and ate it. Right? Is that an easy inference? Sure. Are there more difficult ones? Of course there are, but it shows you what an inference may be.
Defendant made no objection at the time but now contends that this example, with a young man being "guilty" of doing something, turned the jury against him from the outset of this trial, which lasted approximately two weeks. In our judgment, setting forth defendant's argument is sufficient to demonstrate its clear lack of merit. R. 2:11-3(e)(2).

VI
Defendant's final argument is that the trial court imposed a manifestly excessive sentence when it ordered that he serve two consecutive life sentences, each with a thirty-year period of parole ineligibility. Defendant is clearly wrong. State v. Carey, 168 N.J. 413, 429-30, 775 A.2d 495 (2001) (noting that "the multiple-victims factor ... should ordinarily result in the imposition of at least two consecutive terms when multiple deaths ... have been inflicted on multiple victims").
Defendant's convictions and sentence are affirmed.
NOTES
[1] At oral argument, we questioned counsel on the propriety of this procedure, noting that the court took no testimony, and acted without defendant having moved for this relief. Later correspondence directed us to that portion of the transcript at which defense counsel made an "oral motion." That occurred, however, only after the trial court clearly indicated what it intended to do and solicited such a motion from defense counsel.