NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3219-23

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

ERIC T. SEDDENS,
a/k/a ERIC T. SEDDONS,

    Defendant-Appellant.

_____

Argued March 16, 2026 – Decided April 2, 2026

Before Judges Sabatino, Natali and Walcott-Henderson.

On appeal from the Superior Court of New Jersey, Law Division, Camden County, Indictment No. 21-10-2814.

Stefan Van Jura, Assistant Deputy Public Defender, argued the cause for appellant (Jennifer N. Sellitti, Public Defender, attorney; Stefan Van Jura, of counsel and on the briefs).

Brian Uzdavinis, Deputy Attorney General, argued the cause for respondent (Jennifer Davenport, Attorney General, attorney; Brian Uzdavinis, of counsel and on the briefs).

The opinion of the court was delivered by

SABATINO, P.J.A.D.

The primary issue in this appeal of a manslaughter conviction concerns the admissibility of "other crimes" evidence about a defendant's aggravated assault of the same victim at the same location two years earlier, when such evidence is used by the State to prove his motive and identity as the homicide perpetrator.

After a pretrial hearing, the trial court granted the State's contested motion to admit details of the previous assault under N.J.R.E. 404(b). Those details were divulged to the jury with repeated limiting instructions and without sanitization. On the third day of deliberations, the jury found defendant, whose trial counsel argued he was not the fatal assailant, guilty of aggravated manslaughter, unlawful possession of a weapon, and automobile theft.

On appeal, defendant argues the court misapplied Rule 404(b) and abused its discretion in admitting proof of the prior assault. He contends the two offenses are not "signature crimes" and that the State had ample, less inflammatory evidence to establish both his identity and alleged motive to kill the victim. Alternatively, even if we deem the Rule 404(b) proof admissible for those purposes, he asserts the court should have sanitized it to omit what he characterizes as highly prejudicial details.

A-3219-23

We affirm the trial court's application of Rule 404(b) in these circumstances. Although we recognize the concomitant prejudice to defendant, the trial court reasonably found that prejudice was outweighed by the prior assault's considerable probative value in proving motive and identity.

The prior assault—and its aftermath in causing defendant to be imprisoned for over two years—provided important context in establishing his motive to attack the victim a second time. The two offenses were not unique "signature crimes," but such uniqueness was not required to satisfy the Rule 404(b) identity exception. There is no per se bar to admitting evidence of an earlier attack on the same victim of domestic violence for these specified purposes.

Lastly, the court did not abuse its discretion or commit reversible error in declining trial counsel's few suggestions for redacting details of the 2018 assault.

In the unpublished portion of this opinion, we reject defendant's additional arguments concerning the non-removal of a deliberating juror, the admission of certain text messages, and the trial court's imposition of an extended-term sentence.

A-3219-23

I.

The two critical events that bear upon our analysis of the main issue are a June 2018 aggravated assault of the victim, A.A.,[1] and the September 2020 fatal shooting of her at almost the exact same location, yards away from defendant's residence.

A.A.'s Romantic and Co-Parent Relationship With Defendant

Defendant and A.A. began having a romantic relationship in or around 2013. Over the course of their tumultuous relationship, A.A. and defendant had one daughter together, who was born in 2015. At the times relevant to this case, A.A. had custody of the child, who was not residing with defendant.

As the trial court observed at the Rule 404(b) hearing, defendant and A.A. had a history of a series of domestic violence altercations preceding the June 2018 assault. In particular, the court noted the following events dating back to November 2014:

> November 8, 2014, argument, door kicking, domestic disturbance. Okay? December 10, 2014, verbal argument, [d]efendant threw cell phone, broke TV. January 22, 2015, simple assault. February 11, 2015, [d]efendant is arrested with a knife. Victim had forearm fracture. Victim obtained a TRO [Temporary

---

[1] We use initials for the decedent because she was stipulated to be a victim of domestic violence. R. 1:38-3(c)(12).

A-3219-23

Restraining Order] at that time. February 20, 2015, violation of the TRO and contempt. July 29, 2015, I think it's the victim's father who wrestles and fights with the [d]efendant after, if I recall, one of the victim's daughter[s] advises father that – the grandfather that [d]efendant is fighting with the victim. March 30, 2016, approximate date, head laceration to the victim. She's in the hospital. And February 12, 2018, a temporary restraining order violation. So roughly those, just to make sure we'[re] all talking about the incidents. Correct?[2]

The June 29, 2018 Aggravated Assault[3]

On June 29, 2018, A.A. was the victim of an aggravated assault defendant committed against her near his residence at 784 Walnut Street in Camden.

The precise circumstances of the day of the 2018 assault are not entirely clear from the appellate record provided to us or agreed upon by counsel. As described by the prosecutor to the trial court at the Rule 404(b) hearing, on June

---

[2] Both counsel acknowledged the court's recitation of the multiple incidents was correct, although defense counsel argued it would be "overkill" to divulge them at trial to the jury. In any event, it appears undisputed that at the time of the June 2018 assault, A.A. was under the civil protection of an outstanding domestic violence restraining order that she had procured against defendant. The restraining order's existence was not, however, revealed to the jurors at the homicide trial.

[3] The parties have not supplied us with the judgment of conviction for the 2018 assault. Hence, our description of that offense is derived from testimony and other references in the pretrial and trial proceedings in the present case, and information in the presentence report.

29, 2018, defendant "used the premise of telling [A.A.] he had money for her daughter, luring her to Camden." Defendant got into her vehicle and persuaded her to drive them to his residence. According to the prosecutor, when they got to the intersection of 8th and Walnut Street, "she stopped," "he took her keys," and "he got out of the car." She then got out of the car and came towards him.

After A.A. had driven her car to defendant's home, defendant physically attacked her. He left her in the middle of the road bleeding from her head and injured, took her vehicle, and drove away with it.

Following the violent June 2018 encounter, defendant was charged in a four-count indictment with second-degree aggravated assault (count one), third-degree aggravated assault on a domestic violence victim (count two), receiving stolen property (count three), and contempt of a domestic violence restraining order (count four).

Months later, A.A. recanted her allegations against defendant pertaining to this 2018 incident. Nevertheless, the State and defendant entered into a plea agreement in which he pled guilty to count two (third-degree aggravated assault), and the other charges were dismissed.

As the parties later stipulated in the present case, defendant acknowledged he committed a "physical assault" against A.A. on June 29, 2018, resulting in

A-3219-23

his "conviction and an incarceration for the crime of third degree aggravated assault of a domestic violence victim."

Post-Conviction Events

A.A.'s relationship with defendant appears to have temporarily dissipated following his 2018 conviction. In the summer of 2018, she began to date her longtime friend, Andre Campbell. The record reflects that A.A. was dating Campbell until the time of her death in September 2020.

Defendant was released from incarceration on or about August 3, 2020, after being confined for over two years. Text messages admitted into evidence at trial reflect that he began frequently communicating with A.A. very soon after his release, leading to several meetings between them in the months directly preceding her homicide.

A.A.'s Fatal Shooting on September 29, 2020

At approximately 11:39 p.m. on September 29, 2020, Camden County police officers responded to an emergency medical services ("EMS") call to provide aid to a woman found unconscious in the middle of Walnut Street in Camden. The police arrived along with EMS personnel. The scene was described as being merely "yards" away from defendant's residence and the spot where A.A. had been assaulted by him two years earlier.

A-3219-23

Responding officers testified at trial that the victim was discovered "face down" in the middle of the street, and "bleeding from [her] head" due to a gunshot wound. EMS personnel then transported the victim's body to a local hospital, where she was pronounced dead. Fingerprinting thereafter conducted on the body confirmed the victim to have been A.A.

Ensuing Investigation and Defendant's Flight to Florida

The police became aware of defendant's previous history with A.A., and he quickly became the central focus of law enforcement's investigation into A.A.'s fatal shooting. Based on surveillance footage and defendant's cell phone records (that were later admitted into evidence at trial), the State learned that, immediately following A.A.'s shooting, defendant stole her car, drove away from the crime scene, and crossed the Benjamin Franklin Bridge into Philadelphia.

The State's investigation further revealed that defendant continued moving further south in a different vehicle. He checked himself into a motel room in Clearwater, Florida under the name of one of his childhood friends. With the assistance of federal authorities, defendant was found and arrested in Florida on October 15, 2020, roughly two weeks after A.A.'s shooting. Soon thereafter, defendant was extradited back to New Jersey.

The Indictment

In October 2021, a grand jury issued a nine-count indictment charging defendant with first-degree murder, N.J.S.A. 2C:11-3(a)(1)-(2) (count one), and various other offenses.[4]  Defendant pled not guilty.

The State's Pretrial Motion to Admit Proofs under Rule 404(b)

Before trial, the State moved under N.J.R.E. 404(b) to introduce evidence of defendant's previous conviction of the June 2018 aggravated assault of A.A. and his conduct towards A.A. in their relationship preceding that assault.  The State contended these prior acts were admissible under the Rule as proof of defendant's motive to kill A.A. in September 2020, and, additionally, his identity as the shooter.  Defendant opposed the motion.

---

[4]  The other charged offenses were second-degree unlawful possession of weapons, N.J.S.A. 2C:39-5(b)(1) (count two); second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a) (count three); third-degree escape (absconding from parole), N.J.S.A. 2C:29-5(b) (count four); third-degree theft of an automobile, N.J.S.A. 2C:20-3(a) (count five); third-degree aggravated assault on a domestic violence victim, N.J.S.A. 2C:12-1(b)(12) (count six); third-degree stalking, N.J.S.A. 2C:12-10(c) (count seven); fourth-degree criminal contempt, N.J.S.A. 2C:29-9(b)(1) (count eight); and second-degree certain persons not to have weapons, N.J.S.A. 2C:39-7(b)(1) (count nine).

A pretrial judge[5] considered the Rule 404(b) motion in a hearing, at which the State presented evidence of the 2018 aggravated assault and of various interactions between defendant and A.A. during their relationship. The State argued that defendant's conviction of the 2018 offense and his ensuing incarceration gave him a strong motive to retaliate in a violent manner against A.A., who had initially cooperated in the investigation before she recanted. In addition, the State argued that several aspects of the 2018 attack were similar to the 2020 shooting, and those similarities thereby furnished additional incriminating evidence of defendant's identity as the 2020 assailant.

Defendant's attorney[6] countered that the State's arguments failed to sustain its burden to justify admission under Rule 404(b), and that the proofs would be inflammatory to the jury and unduly prejudicial to him at trial. Defendant also asserted that, at the very least, details of the 2018 assault should be sanitized and not divulged to the jury.

---

[5] A different judge later presided over the trial, whom we will distinguish from the pretrial judge as "the trial judge."

[6] Defendant was later represented at trial by a different attorney ("trial counsel").

A-3219-23

For reasons we will elaborate upon in Part II, infra, the pretrial judge granted the State's motion and permitted the State to admit the prior acts as proof of both motive and identity under the authorized exceptions within Rule 404(b). The judge found no feasible means to sanitize the details of the 2018 assault, which would be justifiably presented to show its various "parallels and similarit[ies] of the facts" with the 2020 attack.

Applying the four factors of Rule 404(b) admissibility set forth by the Supreme Court in State v. Cofield, 127 N.J. 328, 338 (1992), the pretrial judge concluded the "prior act" evidence was admissible to show motive and identity: (1) under the first Cofield prong, as motive and identity were "material issues" in dispute between the parties; (2) under the second Cofield prong, as defendant's case involved "a series of similar in kind domestic violence events" that had occurred over a relatively close period of time; (3) under the third Cofield prong, as there was clear and convincing evidence of (a) defendant's conviction and (b) there having been a history of domestic violence between defendant and A.A. over the course of their relationship; and (4) under the fourth Cofield prong, because "the probative value [wa]s not outweighed by prejudicial impact on [defendant]," particularly in light of the added safeguard that a "properly constructed jury charge" articulating for the jury "the purpose for

11

which [the jurors] can consider prior bad acts and [defendant's] conviction" would provide.

The Trial

After several days of jury selection, the case was tried over seven nonconsecutive days in March 2024. The State elicited testimony from fifteen witnesses, including many law enforcement officials who took part in the investigation and also several civilian witnesses, including A.A.'s boyfriend Campbell. The State's witnesses additionally included an expert in forensic pathology, an expert in forensic serology and wound ballistics, a DNA expert,[7] and a historic cell site expert who linked the use of defendant's cell phone to the flight from the shooting scene.

Defendant did not testify on his own behalf, nor did the defense call any witnesses. The defense's trial strategy was essentially to argue third-party guilt,[8]

---

[7] The DNA expert acknowledged that defendant's DNA was not found on the victim, but that Campbell's DNA was found under her fingernails. The State had the expert explain how Campbell's DNA could be present under A.A.'s fingernails for benign, non-assaultive reasons.

[8] In his opening statement to the jury, defendant's trial counsel briefly suggested that the shooting of A.A. might have been accidental, but counsel appears to have abandoned that alternative theory as the trial progressed and did not assert it in summation. For the purposes of the Rule 404(b) issue, defendant admits the shooter had the intent to kill A.A., but he maintains the shooter was someone else.

12

placing the blame for A.A.'s death at the hands of her then-boyfriend, Campbell, among other potential culprits, including unidentified drug dealers.

On the first day of trial, the jury was informed of defendant's 2018 conviction for aggravated assault through the direct examination testimony of Sergeant Matthew Barber, the lead investigator of the homicide. His pertinent testimony on this subject, as elicited by the State, was as follows:

> Q: What did you do [after obtaining an identification of the victim, A.A.]?
>
> A: . . . [W]e checked her name in the police database and we learned that in 2018 she had a boyfriend named Eric Seddens who lived at 784 Walnut Street. And during that time she was a victim of an aggravated assault that occurred right there at the 700 block of Walnut Street. Where he had left her bleeding from the head in the street and took her vehicle.
>
> Q: So once you find this out, what does this mean to you?
>
> A: Obviously, given the circumstances of Mr. Sedden[s]'s house being right there, we wanted to try and locate him.
>
> Q: Okay. So you've now found out the location of the 2018 physical assault, and you know where the 2020 crime of [A.A.'s] murder took place. Did you ever go to the location?
>
> A: Yes.
>
> . . . .

Q: . . . Let's talk about the location in general. Have you been to the location to see exactly where each of these occurred?

A: Yes.

Q: Okay. Did you do any research into the physical assault to figure out exactly where it had occurred?

A: Yes.

Q: And how did you do that?

A: There was body camera footage of the [2018] incident, and we read the officers' reports.

[(Emphasis added).]

At this point in Sergeant Barber's testimony, the prosecutor displayed an easel bearing an image depicting Walnut Street where A.A. had been killed.

Q: I'm going to ask you to take this red marker and to make an X as to the 2018 physical assault that took place.

A: This is 784, so it would be right here.

Q: . . . All right. And you testified you knew where the 2020 murder occurred. Can you please mark that off?

A: The victim's body was found across from here.

Q: . . . Sergeant, you've been out to this location multiple times at this point. Is this a fair and accurate representation of what was out there?

14

A:  Yes.

    . . . .

Q:  . . . Did you ever approximate how many . . . yards [the locations of the respective 2018 and 2020 incidents] were from each other?

A:  Twenty-five, 30 yards from –

Q:  How'd you do that?

A:  Just walked.

[(Emphasis added).]

That same day, at the conclusion of Sergeant Barber's testimony, the trial judge provided the following limiting instruction to the jury:

> The State has introduced evidence that the [d]efendant committed a physical assault on [A.A.] in the year of 2018. Normally, such evidence is not permitted in our rules of evidence. Our rules specifically exclude evidence that a [d]efendant has committed other crimes, wrongs, or acts when it is [used] only to show that he has a disposition o[r] tendency to do wrong, and therefore must be guilty of the charged offenses.
>
> Now, before you can give any weight to this evidence, you must be satisfied that the [d]efendant committed the other crime. If you are not so satisfied, you may not consider it for any purpose. However, our [c]ourt rules do permit evidence of other crimes, wrongs, or acts, when the evidence is used for a specific narrow purpose.

15

[(Emphasis added).]

The court further elaborated:

> . . . Now, in this case, the State has presented evidence that the [d]efendant . . . [c]ommitted an assault on [A.A.] to show [d]efendant's motive for murdering her.
>
> Now, whether this evidence does in fact demonstrate the motive for the murder of [A.A.] is for you to decide. You may decide that the evidence does not demonstrate the motive for the murder of [A.A.], and it's not helpful to you at all. In that case, you must disregard the evidence. On the other hand, you may decide[] that the evidence does demonstrate the motive which the [d]efendant murdered [A.A.] and use it for that specific purpose.
>
> However, you may not use this evidence to decide that the [d]efendant has a tendency to commit crimes, or that he is a bad person. That is[,] you may not decide that just because the [d]efendant has committed other crimes, wrongs, or acts, he must be guilty of the present crimes. I have admitted the evidence only to help you decide the specific – what the specific question[s] of who murdered [A.A.], and why she was murdered. You may not consider for any other purpose and may not find the [d]efendant guilty now, simply because the State has offered evidence that he has committed other crimes, wrongs, or acts.
>
> So in reference to that evidence that you've heard or the testimony that you've heard . . . [y]ou can only consider that testimony for the purposes that I just outlined for you in those instructions that I've just given to you.
>
> [(Emphasis added).]

16

Similar limiting instructions were provided to the jury at length on the second day of the trial, and again on the fifth day of the trial, just before the jury entered into its deliberations.[9]

Both of these subsequent limiting instructions, with the consent of the parties, reflected certain additional clarifications. In the first clarifying instruction, the court advised the jurors:

> Now when the matter was presented the State had introduced evidence that the defendant committed a physical assault on [A.A.] which occurred on June 29th, 2018. I am further instructing you <u>the parties have stipulated that the matter resulted in a conviction and an incarceration</u> for the crime of third degree aggravated assault of a domestic violence victim.
>
> [(Emphasis added).]

In the second clarifying instruction, the court further reinforced:

> Now whether this evidence does in fact . . . demonstrate the motive for which [A.A.] was murdered <u>and/or</u> <u>identifies who murdered [A.A.]</u> is for you to decide. You may decide that the evidence does not demonstrate <u>the motive</u> for which [A.A.] was murdered <u>and/or</u> <u>identifies</u> who murdered [A.A.] is not helpful to you at all.
>
> [(Emphasis added).]

---

[9]  Each of these limiting instructions tracked the relevant language of <u>Model Jury Charges (Criminal)</u>, "Proof of Other Crimes, Wrongs, or Acts (N.J.R.E. 404(b))" (rev. Sept. 12, 2016).

The significance to be drawn from identity, motive, and defendant's 2018 aggravated assault conviction were all consistent themes that were emphasized by the State throughout its closing argument:

> . . . Ladies and gentlemen, . . . [t]he problem becomes, you cannot beat murder when there's this much evidence against you but in the end, it was never really about beating murder because if the [d]efendant had wanted to beat this murder, he never would have taken his phone with him on the run.
>
> If it had been about beating murder, he would have been much more careful about what he said to [A.A.] in those text messages in those two months leading up before he killed her. And if it had really been about beating a murder, he definitely would not have killed her mere steps away from both his house and the place where only two years prior, he had savagely beat her.
>
> . . . .
>
> No, this was never about beating murder. This was about one thing and one thing only and that was taking [A.A.] out of this world forever and it's really quite simple. He had become the man that she showed no interest in. She wasn't different. She was a woman who had moved on and he was the man who was left behind. And in his mind, there was only one way to stop that; kill her.
>
> [(Emphasis added).]

A-3219-23

The prosecutor further spotlighted the similarities between the 2018 and 2020 attacks:

> Let's talk about this [d]efendant's mistakes. Mistake number one, <u>same street</u>. This [d]efendant lives at 784 Walnut Street. <u>We talked about how there was the June 29th, 2018 aggravated assault that was on the same street, mere feet away from his home. In the 2018 case, she had injury to her head and in the murder, she was shot in the head. In both cases, the [d]efendant stole her vehicle</u>.
>
> June 29th, 2018 versus September 29th, 2020. They are literally 27 months to the day. You saw the map. Sergeant Barber stood in front of you and he pointed everything out for you. So we're going to do it again. You have the [d]efendant's house, with the 2018 crime. <u>Fast-forward two years to the murder, mere steps away</u>.
>
> [(Emphasis added).]

Defense counsel did not object to the State's summation, nor move to strike any portions of it.

<u>Foreperson's Note and Inquiry Regarding Juror #9 During Deliberations</u>

On the third day of deliberations, the court received the following note from the jury, written by the jury's foreperson: "Jury has an issue with Number 9 Juror being part of the process." After discussing the appropriate course of action with counsel and interviewing the jury's foreperson in camera to explain the matter further, the court had a colloquy with Juror #9.

19

At the conclusion of her inquiry, the trial judge permitted deliberations to continue, with Juror #9 remaining present, based on assurances she received from Juror #9 that he would be able to appropriately follow the court's instructions.[10]

Verdict

At approximately 2:45 p.m. on March 22, 2024, the jury announced that it had reached a verdict. The jury found defendant guilty of aggravated manslaughter (as a lesser included offense of murder), unlawful possession of a weapon, and automobile theft, but found him not guilty of either murder or possession of a weapon for an unlawful purpose.[11]

Sentencing

The trial judge sentenced defendant on May 17, 2024. The judge granted the State's motion for a persistent-offender extended term, pursuant to N.J.S.A. 2C:44-3(a). Defendant did not contest the existence of the previous convictions

---

[10] We discuss this interaction and the legal analysis stemming from it in more detail in Part III(A), infra.

[11] All other charges except for those specified here appear to have been previously dismissed before trial by the State.

qualifying him for persistent offender status, but argued that he should receive a lower sentence based on the balance of aggravating and mitigating factors.

The court sentenced defendant on his aggravated manslaughter conviction to a seventy-year term of imprisonment with an 85% period of parole ineligibility, pursuant to the No Early Release Act ("NERA"), N.J.S.A. 2C:43-7.2. Lesser concurrent terms were imposed on defendant's weapon and automobile theft convictions. All other counts were dismissed.

Appeal

This direct appeal ensued. Defendant raised the following points in his brief:

> POINT I
>
> DEFENDANT WAS DENIED A FAIR TRIAL BY THE INTRODUCTION OF OTHER-CRIME EVIDENCE WHOSE UNDUE PREJUDICE WAS INSURMOUNTABLE. U.S. Const. amends. V and XIV; N.J. Const. art. I, pars. 1, 9, and 10.
>
> POINT II
>
> DEFENDANT WAS DENIED HIS RIGHT TO AN IMPARTIAL JURY BY THE EMPANELING OF AN UNSERIOUS JUROR WHO SOUGHT A QUICK RESOLUTION OF THE CASE SO THAT HE COULD RETURN TO WORK. U.S. Const. amends. VI and XIV; N.J. Const. art. I, par. 10.

A-3219-23

POINT III

THE FAILURE TO EXCISE NUMEROUS DRUG
REFERENCES FROM THE TEXT MESSAGES
BETWEEN DEFENDANT AND A.A. DENIED
DEFENDANT HIS RIGHT TO DUE PROCESS. U.S.
Const. amends. V and XIV; N.J. Const. art. I, pars. 1,
9, and 10. (Not Raised Below).

POINT IV

RESENTENCING IS REQUIRED BECAUSE
SENTENCING DEFENDANT TO AN EXTENDED
TERM AS A PERSISTENT OFFENDER VIOLATED
HIS FIFTH, SIXTH, AND FOURTEENTH
AMENDMENT RIGHTS. (Not Raised Below).

Before oral argument on the appeal, we requested from counsel and were supplied with supplemental briefs further addressing the identity and motive exceptions under Rule 404(b). The State also submitted a letter pursuant to Rule 2:6-11(d)(1), calling our attention to the New Jersey Supreme Court's recent opinion in State v. Carlton, 262 N.J. 629 (2026), concerning how a jury's potential role in fact-finding affects extended term sentences.

II.

The evidence rule at the heart of this appeal, N.J.R.E. 404(b), provides as follows:

(b) Other Crimes, Wrongs or Acts.

(1) Prohibited Uses.  Except as otherwise provided by Rule 608(b), evidence of other crimes, wrongs, or acts is <u>not admissible to prove a person's disposition in order to show that on a particular occasion the person acted in conformity with such disposition</u>.

(2) Permitted Uses.  This evidence <u>may</u> be admitted for <u>other purposes</u>, such as proof of <u>motive</u>, opportunity, intent, preparation, plan, knowledge, <u>identity</u>, or absence of mistake or accident when such matters are relevant to a material issue in dispute.

[N.J.R.E. 404(b) (emphasis added).]

A.

Before we analyze the Rule's application to the present case, it is instructive to consider its historical underpinnings and associated rules and case law.

<u>Common Law Origins of the Limited Non-Propensity Uses of "Other Crimes" Evidence</u>

Rule 404(b) is the modern-day formulation of English common law principles dating back centuries.  "The rule prohibiting the use of evidence of other crimes to prove the defendant's propensity to commit the crime charged has its roots in Great Britain's Treason Act of 1695," which "reformed [Britain's] evidentiary rules, and expressly provided that only conduct that had been specifically mentioned in the indictment could be proven against a defendant at trial for treason."  Jennifer Y. Schuster, <u>Uncharged Misconduct under Rule</u>

23

404(b):  The Admissibility of Inextricably Intertwined Evidence, 42 U. Miami L. Rev. 947, 951-52 (1988); see also Julius Stone, The Rule of Exclusion of Similar Fact Evidence:  America, 51 Harv. L. Rev. 988, 991 (1938) ("All the American decisions on this matter prior to 1840 rely exclusively or principally upon English authorities").

"Other crimes" evidence was generally held to be admissible by English courts throughout the seventeenth and eighteenth centuries "unless the sole purpose of its introduction was to suggest the defendant's character as a basis for inferring that the defendant committed the crime charged."  Schuster, 42 U. Miami L. Rev. at 952 (emphasis added).

As such, "English courts permitted the use of uncharged misconduct evidence if it was probative of a relevant issue other than the defendant's character."  Ibid. (emphasis added).  Such a common-law rule broadly reflected

> a compromise between two extreme possibilities:  on the one hand that other acts, because they cast light on propensities and thence on the issues, may always be fully explored; on the other hand that other acts must be absolutely excluded because of the prejudice, confusion, and surprise their use would create.  The common law accepted neither extreme.  It rejected the former; it only adopted the latter subject to the all-important reservation that if other acts were relevant to guilt of the crime charged otherwise than merely through propensity, then those acts might like any other relevant facts be explored.

24

[Stone, 51 Harv. L. Rev. at 1033-34 (emphasis added).]

Like similar rules pervasive in other American jurisdictions until the mid-twentieth century,[12] New Jersey's own long-standing common-law rule similarly "excluded other-crimes evidence when [it was] offered solely to prove a defendant's propensity to commit crime." State v. Stevens, 115 N.J. 289, 299 (1989) (emphasis added). However, New Jersey courts explicitly recognized "several exceptions" to the general rule that, "upon the trial of a person for one crime, evidence that he has been guilty of other crimes is irrelevant." State v. Raymond, 53 N.J.L. 260, 264 (Sup. Ct. 1891).

Two of these exceptions noted in Raymond, which are topically invoked by the State in this case, included: (1) "when the circumstances of the crime charged and those of an extraneous crime indicate that they were both committed by the same person;" and (2) "when the commission of a different offense discloses a motive for the commission of the offense charged." Id. at 264-65 (emphasis added).

---

[12] See, e.g., Smallwood v. Commonwealth, 255 S.W. 106, 107-08 (Ky. 1923); Washington v. State, 8 Tex. Ct. App. 377, 379-80 (Tex. Ct. App. 1880).

The Federal Evidentiary Standard, Fed. R. Evid. 404(b)

"In 1961, the Judicial Conference of the United States authorized [Chief Justice] Earl Warren . . . to appoint an advisory committee to study the advisability and feasibility of uniform rules of evidence for use in the Federal courts", with the Conference ultimately expressing the view "that if uniform rules were found to be advisable and feasible, they should be promulgated."  S. Rep. No. 93-1277, at 7051 (1974).  The Federal Rules of Evidence were enacted by Congress and signed into law by President Gerald Ford roughly a decade-and-a-half later on January 2, 1975.  See Pub. L. 93-595, §1, 88 Stat. 1926 (Jan. 2, 1975).

Currently, Fed. R. Evid. 404(b)(1) prohibits as admissible evidence "any other crime, wrong, or act . . . to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."  This principle can be simply termed "the anti-propensity doctrine."  However, under Fed. R. Evid. 404(b)(2), such evidence "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."  (Emphasis added).

"After the enactment of the Federal Rules of Evidence in 1975, federal courts generally viewed [Fed. R. Evid.] 404(b) as a codification of the common

law principles existing in that jurisdiction prior to the Rule." Schuster, 42 U. Miami L. Rev. at 959.

When Fed. R. Evid. 404 was first proposed in 1972, Congress acknowledged in its Advisory Committee Notes that:

> Subdivision (b) deals with a specialized but important application of the general rule excluding circumstantial use of character evidence. Consistently with that rule, evidence of other crimes, wrongs, or acts is not admissible to prove character as a basis for suggesting the inference that conduct on a particular occasion was in conformity with it. However, the evidence may be offered for another purpose, such as proof of motive, opportunity, and so on, which does not fall within the prohibition. In this situation the rule does not require that the evidence be excluded. No mechanical solution is offered. The determination must be made whether the danger of undue prejudice outweighs the probative value of the evidence in view of the availability of other means of proof and other facts appropriate for making [a] decision of this kind under [Fed. R. Evid.] 403.[13]
>
> [Fed. R. Evid. 404, Advisory Comm.'s note to 1972 proposed rules (emphasis added).]

---

[13] Similar to our state's analog in N.J.R.E. 403, Fed. R. Evid. 403 provides that the court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

<u>Fed. R. Evid. 404(b)(2)'s "Motive" and "Identity" Provisions</u>

The use of "other crimes" evidence to substantiate a criminal defendant's motive to commit the present charged offense(s) is a well-established exception to the anti-propensity doctrine. "Uncharged crimes introduced to establish motive fall outside the rule of categorical exclusion." Robert P. Mosteller et al., <u>McCormick on Evidence</u> § 190.5 (9th ed. 2025). "The evidence of motive may be probative of the identity of the criminal or of malice or specific intent." <u>Ibid.</u>

As other evidence law scholars have likewise observed, "[m]otive is normally not an element of a crime but may be relevant to proving an actor's intent or identifying the defendant as the one who committed the crime." Christopher B. Mueller & Laird C. Kirkpatrick, <u>Evidence</u> § 4.17 (5th ed. 2012). Such possible motives may include, for instance, "personal animosity." <u>Ibid.</u>; see, e.g., <u>Gov't of V.I. v. Harris</u>, 938 F.2d 401, 420 (3d Cir. 1991) (in which "other crimes" evidence of a husband's previous acts of domestic violence against his wife was properly admitted in a homicide prosecution to show his motive and intent to kill her).

"While proof of some common motives (desire for money, or drugs, or sex) may do little to distinguish a particular defendant from the populace at large, such proof <u>may shed important light on [the actor's] behavior and give</u>

meaning to other evidence connecting [the actor] to the crime." Mueller & Kirkpatrick, § 4.17 (emphasis added). Notably, "[w]here prior crimes are offered to prove motive, they need not be similar in nature to the charged offense." Ibid.; see, e.g., United States v. Shriver, 842 F.2d 968, 974 (7th Cir. 1988).

Identity evidence, meanwhile, frequently has been found to coincide with other categories of evidence explicitly permitted under Fed. R. Evid. 404(b)(2), such as motive, intent, or opportunity. See Mosteller, § 190.8; see also Mueller & Kirkpatrick, § 4.17 ("Identity overlaps with several other categories. Proof of defendant's motive, knowledge, opportunity, intent, plan, and preparation may all tend to identify defendant as the perpetrator").

"Usually, however, prior acts show identity by establishing a distinctive modus operandi," a concept often implicitly linked with that of "signature crimes," in which "[a] defendant is shown to have committed crimes in a distinctive way." Mueller & Kirkpatrick, § 4.17. "Quite rightly, most courts require a high degree of similarity before admitting evidence of prior crimes to establish modus operandi, even more than for intent, although the prior crimes need not be identical in every detail." Ibid. (emphasis added). In admitting such "signature crime" evidence for purposes of establishing identity, "[t]he pattern

and characteristics of the crimes <u>must be so unusual and distinctive as to be like a signature</u>." Mosteller et al., § 190.3.[14] However, as we will discuss, <u>infra</u>, a "signature crime" scenario is only one subset of permissible identity proofs under Rule 404(b); other situations may qualify for admission as identity proof under the Rule as well.

<u>The Development of New Jersey's Other-Crimes Evidentiary Standard, N.J.R.E. 404(b)</u>

In our state, "the adoption of evidence rules is governed by statute—the Evidence Act, 1960, N.J.S.A. 2A:84A-33 to -44—and the process of adopting such rules involves all three branches of government." <u>State v. Byrd</u>, 198 N.J. 319, 342 (2009). One path by which new evidentiary rules may be adopted involves review by "a Judicial Conference, which includes judges, lawyers, and academics, to consider a draft of [such] rules." <u>Ibid.</u> It is through this process, after the Conference's recommendation was subsequently approved by the Supreme Court, adopted by the Legislature, and signed into law by the

---

[14] <u>Black's Law Dictionary</u> 469 (12th ed. 2024) defines "signature crime" as "distinctive crimes so similar in pattern, scheme, or modus operandi to previous crimes that it identifies a particular defendant as the perpetrator." "Modus operandi" is additionally defined as "[a] method of operating or a manner of procedure; esp[ecially], a pattern of criminal behavior so distinctive that investigators attribute it to the work of the same person." <u>Id.</u> at 1201.

Governor, "the 1967 and current 1993 Rules of Evidence, 101 to 1103, were adopted." Id. at 342-43.

In consultation with the State Legislature, our Supreme Court adopted the "New Jersey Rules of Evidence" on September 11, 1967. See State v. Stevens, 115 N.J. 289, 299 (1989). Included in these rules was Evid. R. 55, the direct precursor to N.J.R.E. 404, which read, in full:

> Subject to Rule 47,[15] evidence that a person committed a crime or civil wrong on a specified occasion, is inadmissible to prove his disposition to commit [a] crime or civil wrong as the basis for an inference that he committed a crime or civil wrong on another specified occasion but, subject to Rule 48,[16] such evidence is admissible to prove some other fact in issue including motive, intent, plan, knowledge, identity, or absence of mistake or accident.
>
> [Evid. R. 55 (1967) (since repealed) (emphasis added).]

In an Annotation to its 1955 report submitted to the Supreme Court, the Committee on the Revision of the Law of Evidence said of then-proposed Evid. R. 55:

---

[15] Rule 47 specified, among other things, the means for proving a character trait and other provisions not pertinent here.

[16] "Evidence of a trait of a person's character with respect to care or skill is inadmissible as tending to prove the quality of his conduct on a specified occasion." Evid. R. 48 (1967) (since repealed).

31

The rule in criminal cases is that evidence of other crimes is inadmissible solely to show propensity to commit crime. Unfortunately, however, the courts frequently state the general rule to be that evidence of other crimes is inadmissible and then list certain exceptions–when the former crimes tend to establish intent, motive, etc. The Rule here adopts the universal rule of requiring independent relevancy. It should be noted, however, that admission of these crimes [is] all made subject to the discretion of the trial court by virtue of Rule 45.[17] This is certainly a wise decision. An accused should be protected against adverse bias by evidence of his implication in other crimes. However, if disclosure of other crimes is merely incidental to proof otherwise material, it should be admitted. There is thus a balancing of interests which must be made by the trial court.

[Report of the Committee on the Revision of the Law of Evidence to The Supreme Court of New Jersey 108 (May 25, 1955) (comm. annotation to Evid. R. 55) (emphasis added).]

Years later, the Supreme Court Committee on Evidence in its 1963 report

to the Supreme Court repeated this general sentiment, stating that:

[T]he responsibility of the trial judge in administering Rule 55 is particularly grave and Rule 45 should especially come into play here. The trial judge should be careful to exclude other torts or crimes evidence,

---

[17] Eventually renumbered and adopted as Rule 4: "The judge may in his discretion exclude evidence if he finds that its probative value is substantially outweighed by the risk that its admission will either (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice or of confusing the issues or of misleading the jury." Evid. R. 4 (1967) (since repealed).

even though it is independently relevant, wherever he can reasonably do so without damaging the plaintiff's or prosecutor's case. For example, if the prosecutor has adequate proof of identity, or of motive and the like, he should not be permitted to use the highly inflammatory evidence of other crimes to establish those facts.

[Report of the New Jersey Supreme Court Committee on Evidence 103 (Mar. 1963) (comm. on Evid. R. 55) (emphasis added).]

Additionally, the 1963 Committee further noted that:

[T]he trial judge should insist on high standards of relevance and of probative value before admitting "other crimes" evidence, e.g., that it is not remote, or that, by virtue of its similarity, it actually sheds sufficient light on an independently relevant issue. It is especially important that the trial judge not admit other crimes evidence by redefining what is actually propensity or disposition and calling it "motive" or "plan." Finally, where identity is an issue the "other crimes" should be so similar to the crime in issue as to actually provide evidence of high probative value on the issue of identity.

[Ibid. (emphasis added).]

Nearly three decades later, N.J.R.E. 404 was adopted by our Supreme Court on September 15, 1992, to be made effective July 1, 1993. See Byrd, 198 N.J. at 342-43. In its 1991 comment to the rule, the Supreme Court Committee articulated that N.J.R.E. 404 "generally follows [Fed. R. Evid.] 404 and replaces N.J. Evid. R. 46, 48, and 55. . . . The formulation of paragraph (b) of this rule

33

follows Fed. R. Evid. 404(b) rather than the [previous] New Jersey analogue, N.J. Evid. R. 55 . . . ."  Biunno, Weissbard & Zegas, Current N.J. Rules of Evidence, off. cmt. on N.J.R.E. 404 (2026) (emphasis added).  At the time of their adoption, the only textual differences between N.J.R.E. 404(b) and Fed. R. Evid. 404(b) were that the former "use[d] the word 'disposition' [previously] contained in [Evid. R. 55] and . . . add[ed] in the final phrase 'when such matters are relevant to a material issue in dispute.'"  Ibid.

Admissibility of Other Crimes Evidence, N.J.R.E. 404(b)

When considering the admissibility of evidence under N.J.R.E. 404(b), courts are instructed to apply the standard adopted by the Supreme Court in Cofield, 127 N.J. at 338, which requires careful analysis of four specific factors:

> 1.  The evidence of the other crime must be admissible as relevant to a material issue;
>
> 2.  It must be similar in kind and reasonably close in time to the offense charged;[18]
>
> 3.  The evidence of the other crime must be clear and convincing; and

---

[18]  Note that the Supreme Court has held that the second prong of the Cofield formulation need not be applied in every case, unless the facts of the case replicate the circumstances of Cofield itself.  State v. Green, 236 N.J. 71, 83 (2018); see also State v. Williams, 190 N.J. 114, 131-34 (2007).

4. The probative value of the evidence must not be outweighed by its apparent prejudice.

[127 N.J. at 338 (internal citation omitted) (emphasis added); see also State v. Barden, 195 N.J. 375, 389 (2008).]

To exclude other-crimes evidence under the fourth Cofield factor, the opposing party only needs to show that the prejudice outweighs—rather than substantially outweighs (as in an N.J.R.E. 403 analysis)—the probative value of the evidence sought for admission. See Green, 236 N.J. at 83-84; see also State v. Rose, 206 N.J. 141, 160 (2011).

In adopting these four factors, the Supreme Court in Cofield advised that:

The "inflammatory characteristic of other-crime evidence . . . mandates a careful and pragmatic evaluation by trial courts, based on the specific context in which the evidence is offered, to determine whether the probative worth of the evidence outweighs its potential for undue prejudice." . . . Even when other-crime evidence is admissible . . . to show propensity to engage in specific conduct, we insist on sufficient similarity between the "objects, methods, and particular mental states" as well as the "factual nexus between the crimes" so as not to mislead the jury to focus on a defendant's general bad character. . . .

Although federal decisions suggest a more permissive approach . . . the approach has not been without a price in trial management. . . . Courts do well then to hew closely to the requirements and underlying rationale of [Fed. R. Evid. 404(b)].

35

> [Cofield, 127 N.J. at 334-35 (internal citations omitted) (emphasis added).]

"Nevertheless," our courts have repeatedly made clear that "some types of evidence, such as evidence of motive or intent, 'require a very strong showing of prejudice to justify exclusion.'"  Green, 236 N.J. at 84 (emphasis added) (quoting State v. Garrison, 228 N.J. 182, 197 (2017)).  Furthermore, "despite [the Supreme Court's] imposition of a stringent standard for the admission of other-crimes evidence, 'our courts have not frequently excluded highly prejudicial evidence under the fourth prong of Cofield.'"  Garrison, 228 N.J. at 198 (quoting State v. Long, 173 N.J. 138, 162 (2002)) (emphasis added).

Sanitization and Limiting Instructions for N.J.R.E. 404(b) Evidence

"To reduce 'the inherent prejudice in the admission of other-crimes evidence,' trial courts [in our State] are required 'to sanitize the evidence when appropriate' . . . ."  Green, 236 N.J. at 84 (quoting Rose, 206 N.J. at 161) (emphasis added).  Sanitization requires a trial judge to "confine [the Rule 404(b) evidence's] admissibility to those facts reasonably necessary" for the probative purpose for which it is admitted.  State v. Collier, 316 N.J. Super. 181, 195 (App. Div. 1998).

Additionally, "limiting instructions must be provided to inform the jury of the purposes for which it may, and for which it may not, consider the

36                                                                    A-3219-23

evidence . . . ." Rose, 206 N.J. at 161. Generally, in order for a curative instruction to be considered effective, the instruction should be delivered shortly after the jury hears the offending evidence. State v. Herbert, 457 N.J. Super. 490, 506 (App. Div. 2019). Because delay may lead to the inadmissible evidence becoming "cemented into a storyline the jurors create in their minds during the course of trial," it is "'the better practice' to give limiting instructions at the time the evidence is presented and again in the final jury charge." Ibid. (quoting State v. Blakney, 189 N.J. 88, 93 (2006)). Furthermore, "[a]s for substance, a specific and explanatory instruction is often more effective than a general, conclusory one." Ibid. An instruction must describe the prejudicial comments "with enough specificity to enable the jury to follow the instruction." Id. at 507.

Our courts have traditionally applied a premise that jurors are presumed to adhere to a court's instructions. See State v. Loftin, 146 N.J. 295, 390 (1996). Even so, in extreme instances of especially inflammatory proof, that presumption may be overcome. For instance, in Herbert, a defendant contested a trial judge's curative instruction regarding a detective's testimony, in which the detective twice stated that he recognized the defendant as a "gang member." Herbert, 457 N.J. Super. at 499. We concluded that the court's instruction to the

jury to ignore that testimony was insufficiently curative because it was overly "vague" and failed to address the prejudicial effect of the detective specifically referring to the defendant as a gang member. Id. at 510.

The Motive Exception as Applied in New Jersey

Even before the adoption of N.J.R.E. 404(b), proof of a defendant's other-crime evidence was recognized in our State as an acceptable method of substantiating a criminal defendant's motive to commit the presently charged offense. See, e.g., State v. Yormark, 117 N.J. Super. 315, 336 (App. Div. 1971). "[M]otive evidence is that which discloses why the defendant committed the present offense." Biunno, Weissbard & Zegas, off. cmt. 9.1 on N.J.R.E. 404. "Accordingly, if evidence of prior crimes sheds light on the reasons why the defendant committed the present offense, it is admissible for that purpose." Ibid.

Proof of a defendant's previous wrongful acts against the same victim has been long recognized in New Jersey case law as admissible proof of a motive to harm that same victim. For example, in State v. Slocum, 130 N.J. Super. 358, 362-63 (App. Div. 1974), we held the State properly could present evidence in a robbery and assault trial that the defendant had robbed the victim's store years earlier, and that the victim had testified against defendant at trial concerning that earlier offense. Comparably, in State v. Angoy, 329 N.J. Super. 79, 86-88 (App.

Div. 2000), other-crimes evidence that the defendant had assaulted and choked the victim, his girlfriend, about one month before her death, was deemed admissible in a homicide case as proof of his motive. More recently, in Rose, 206 N.J. at 164-67, the Supreme Court held that defendant's previous attempted murder of the same victim was properly admitted under N.J.R.E. 404(b) in a homicide case, given that the trial judge issued appropriate limiting instructions to the jury.

That said, "the 'motive' supported by other-crimes evidence must be the motive to commit the particular crime at issue in the prosecution, not merely a general, undifferentiated motive to engage in criminal behavior." Biunno, Weissbard & Zegas, cmt. 9.1 on N.J.R.E. 404; see, e.g., State v. J.M., Jr., 438 N.J. Super. 215, 222-23 (App. Div. 2014) (holding that the prosecution's proffered evidence that the defendant had sexually molested a customer in defendant's massage parlor did not logically suggest a motive to digitally penetrate the victim, only an alleged propensity); State v. Mazowski, 337 N.J. Super. 275, 282-83 (App. Div. 2001) (disallowing such an "undifferentiated" motive to steal in a robbery case as a basis for the State to admit Rule 404(b) evidence of a defendant's past drug use and addiction).

<u>The Identity Provision of N.J.R.E. 404(b), Modus Operandi, and Signature Crimes Cases</u>

As the State has acknowledged in its supplemental brief, case law instructs that "[t]he standard for admitting other-crimes evidence <u>to prove identity</u> <u>becomes more stringent</u> when the State attempts to link a particular defendant to a crime on the basis of <u>modus operandi</u>, or a signature way of committing the crime." <u>State v. Sterling</u>, 215 N.J. 65, 93 (2013) (emphasis added). In considering such "signature crimes cases," New Jersey courts have held that "''the prior criminal activity with which defendant is identified <u>must be so nearly</u> <u>identical in method</u> as to earmark the crime as defendant's handiwork.'''" <u>Id.</u> at 95 (quoting <u>State v. Fortin</u>, 162 N.J. 517, 532 (2000) ("<u>Fortin I</u>") (quoting <u>State v. Reldan</u>, 185 N.J. Super. 494, 502 (App. Div. 1982))) (emphasis added); <u>see</u> <u>also</u> <u>State v. Inman</u>, 140 N.J. Super. 510, 517 (App. Div. 1976) ("The admissibility of [signature] evidence is generally limited to those situations where 'a crime has been committed by some novel or extraordinary means or in a peculiar or unusual manner' . . . .").

"It is self-evident that the greater the number of points of comparison available, the more reliable the identification made therefrom." <u>State v. Fortin</u>, 189 N.J. 579, 612 (2007) ("<u>Fortin III</u>"). Moreover, "[i]t is for that specific reason that we allow for the admission of evidence of other crimes in order to

prove the identity of the actor," particularly when "'the crimes were committed in so distinctive and unusual a manner that they may be said to be the handiwork of the same person.'" Ibid. (internal citation omitted) (emphasis added).

That said, we reiterate that certain prior bad acts may be admissible as proof of identity under New Jersey law without qualifying as "signature crimes." See, e.g., Loftin, 146 N.J. at 395-96 (upholding the admission of non-signature evidence that the defendant had attempted to use a stolen credit card as proof of his involvement in a homicide); State v. Baluch, 341 N.J. Super. 141, 192 (App. Div. 2001) (upholding the admission of non-signature prior bad acts to help rebut a defendant's claim that a victim's injuries were caused "at the hand of someone else"); State v. Carswell, 303 N.J. Super. 462, 471 (App. Div. 1997) (affirming the admission of non-signature proof of defendants' previous possession of a handgun to show that the "defendant in fact owned the gun").

In addition, case law from other jurisdictions, albeit using a different balancing test than New Jersey's rule of presumptive exclusion, has conceptually recognized that other-crimes evidence against the same victim may be relevant to establishing the current perpetrator's identity.[19]

---

[19] United States v. Veneno, 107 F.4th 1103, 1117 (10th Cir. 2024) (upholding the admission of testimony that a defendant had physically assaulted his then-

B.

Guided by these evidentiary principles, we now apply them to the trial court's Rule 404(b) ruling. Our discussion is governed by well-settled principles of appellate review. Generally speaking, "the admissibility of evidence at trial is left to 'the sound discretion of the trial court.'" Green, 236 N.J. at 80-81 (quoting State v. Willis, 225 N.J. 85, 96 (2016)). "A trial court's evidentiary ruling is therefore reviewed on appeal for abuse of discretion." Id. at 81.

---

girlfriend days before he received a second assault charge for attacking her to be admissible for identification purposes under Fed. R. Evid. 404(b) because it "showed he had beaten her several days before in the same place, in the same way, and for the same reason, which makes it more likely that [the victim's] identification of [d]efendant was reliable") (emphasis added); United States v. Yellow, 18 F.3d 1438, 1441 (8th Cir. 1994) (deeming admissible under Fed. R. Evid. 404(b) "evidence that a defendant committed prior sexual assaults against the victim [a]s relevant in identifying defendant as the person who committed the assault charged in the indictment"); United States v. Lewis, 780 F.2d 1140, 1142 (4th Cir. 1986) (noting the similarity in the method of assaults committed by the defendant against the same victim on repeated occasions was "probative of identity"); Brim v. State, 624 N.E.2d 27, 34 (Ind. Ct. App. 1993) (observing that where two witnesses had testified at trial that the defendant had previously beaten the same victim on previous occasions, the prior beatings were admissible to prove defendant's identity); and State v. Enoch, 820 S.E.2d 543, 557-58 (N.C. Ct. App. 2018) (holding that similarities between a defendant's prior assaults on, and alleged subsequent murder of, the same victim were sufficient under North Carolina's equivalent to Fed. R. Evid. 404(b) to infer "[d]efendant perpetrated both prior assaults on [the victim] and her murder" and that the trial court "properly admitted [such] evidence . . . for the purpose of showing identity") (emphasis added).

42

Pertinent here, "sensitive admissibility rulings regarding other-crimes evidence made pursuant to Rule 404(b) are reversed '[o]nly where there is a clear error of judgment.'" Id. at 81 (quoting Rose, 206 N.J. at 157-58) (alteration in original) (emphasis added). That said, we review de novo any pure questions of law presented. Manalapan Realty, L.P. v. Twp. of Comm. of Manalapan, 140 N.J. 366, 378 (1995).

Proof-of-Motive Analysis

As the trial court aptly recognized, one of the dual reasons the State presented evidence of the 2018 assault to the jury was to fortify its proof of defendant's motive to harm A.A. in their 2020 encounter. Defendant's admitted physical attack on A.A. in 2018, which caused him to be imprisoned for over two years, was highly relevant to why defendant would have wanted to harm A.A. again two years later. Having initially cooperated with the police in 2018 and identified defendant as her attacker, A.A. played an important, albeit temporary, role in his arrest and subsequent prosecution. That surely provided defendant with a motive to retaliate against her violently within a short period of time after he was released from prison.

Apart from substantiating this retaliatory motive, the previous incident in 2018 also corroborates an overall motive by defendant to continue his long

43

pattern of domestic abuse against A.A. that began years earlier. Defendant's physical assault of A.A. on the street outside of his residence in 2018 is reflective of deep-rooted animosity towards her.

The pretrial judge rightly appreciated the strong probative force of the 2018 assault in evidencing defendant's violent motives towards A.A. Although defendant conceded the person who shot A.A. in the head had the intent to kill her, he denied that he was that shooter. Moreover, defendant denied he had a motive to harm A.A. He emphasized in this regard the fact that A.A. ultimately recanted her accusations about the 2018 assault.

But by the time A.A. recanted, the mechanisms of law enforcement were already in motion. To be sure, had A.A. not recanted, it is conceivable the State might have obtained a conviction of more serious crimes and a harsher sentence. Nevertheless, the motive for revenge and retaliation readily could have lingered.

The evidence of a foul motive was highly probative, and the pretrial judge did not abuse her discretion in finding under the fourth Cofield factor that it outweighed the asserted prejudice. The other three Cofield factors are also easily met, particularly since the 2018 assault was confirmed by a guilty plea, judgment of conviction, and the parties' stipulation in this case.

Proof-of-Identity

We likewise discern no abuse of discretion in the trial court's admission of the 2018 assault to help substantiate defendant's contested identity as the 2020 shooter. As the pretrial judge found, there are many characteristics in common between the 2018 and 2020 attacks. These include, but are not limited to, the proximity of both attacks to defendant's residence, defendant's efforts in both cases to lure A.A. to that chosen location, conducting the attacks in the middle of Walnut Street, the targeting of the victim's head, the confiscation of A.A.'s car keys, and defendant's flight driving the victim's car from the scene.

We agree with defendant that these common characteristics are not so unusual or unique to comprise a "signature crime" pattern of criminal wrongdoing. The shared characteristics do not reflect the offenses were committed through "novel or extraordinary means or in a peculiar or unusual manner." Inman, 140 N.J. Super. at 517. Even so, they are of sufficient probative value to be admitted as proof of identity.

Defendant argues the State presented other proofs that also showed his identity as the shooter, such as the cell tower records tracing his movements. But at trial, his defense counsel generally contested those other proofs of

identity, arguing they were weak or inconclusive. Defendant cannot have it both ways.

The trial court did not err in its analysis in allowing the State to bolster the evidence of identity. Moreover, as noted above, the motive shown by the 2018 assault reinforces the State's case in establishing identity.

Nor do we believe that the commonality of the same victim in the two attacks renders the "other crimes" evidence inadmissible. Defendant acknowledges he is not advocating a per se bar to such "same victim" identity proofs. Indeed, adopting such a per se bar would be contrary to the strong public policies reflected in the state's domestic violence prevention laws. See N.J.S.A. 2C:25-18. We are satisfied that, in the circumstances presented here, the jury was appropriately informed that the person who shot A.A. in 2020 had assaulted her before.

We recognize that the evidence of the 2018 attack had the potential to evoke feelings of revulsion among jurors. But, as we will now discuss, the trial court issued—three times and without objection—carefully crafted limiting instructions urging them to consider the 2018 assault solely for the purposes of motive and identity, and to not infer that defendant had a propensity to behave as a bad person. Although it is not dispositive, we also note that the jury did not

render a verdict until the third day of deliberations and found defendant not guilty of the most serious charged crime, which suggests the jury did not make an inflamed "snap judgment" of guilt.

### The Court's Repeated Limiting Instructions

The limiting instructions issued by the trial judge at three separate intervals of the case appropriately hewed to the model jury charges. Generally speaking, adherence to the model charges presumptively reflects that the charges were appropriate. See, e.g., State v. Davis, 390 N.J. Super. 573, 594-98 (App. Div. 2007). The instructions clearly urged and reminded the jurors to consider the evidence of the 2018 assault for only the specified limited purposes and not as proof of defendant's bad character. Nothing else needed to be said.

We do not regard this case to be tantamount to the extremely inflammatory references to gang membership a testifying detective twice blurted out in violation of the court's pretrial admonition that provoked the need for reversal in Herbert, 457 N.J. Super. at 506. The Rule 404(b) uses here were justified and well explained to the jury. Although the chances for prejudice were considerable, the trial court did not err in balancing the heavier probative value against that harm and in addressing it with properly administered limiting instructions.

Sanitization

Defendant argues that we must reverse his conviction because the trial court declined to sanitize the evidence of the 2018 assault. On appeal, he posits several details that he claims should have been omitted. But in the pretrial proceedings, his former counsel essentially specified only two options. First, counsel asked the court to bar the State from divulging any information about the assault, other than the title and degree of his previous offense. Alternatively, counsel argued that the court should have redacted any references to defendant absconding in the victim's car in 2018. The trial court was not obligated to adopt either proposal.

First, as to the near-complete sanitization advocated by defense counsel at the Rule 404(b) hearing, sanitizing the evidence in such a comprehensive way would have unfairly deprived the State of presenting the highly relevant nexus of motive and identity information conveyed through Sergeant Barber's testimony. The Sergeant essentially provided the jurors with basic facts about the 2018 incident that were germane to motive and identity, although recounting them with certain descriptive language. Moreover, the Sergeant did not even mention defendant's luring of A.A. with money for the couple's child in 2018.

The pretrial judge reasonably concluded there was no practical way to sanitize the 2018 facts without stripping them of their logical potency.

As to defendant's second suggestion, we recognize it was not imperative for the State to inform the jury that in 2018, defendant had driven away in the victim's car. But the inclusion of that one detail did not deny him a fair trial. The State did not say that defendant had committed the crime of "carjacking" in 2018, and the stipulation presented to the jury about that case referred only to a conviction for assault. The use of the victim's car in 2018 was mentioned only once in the prosecutor's closing argument, without further elaboration. We do not regard the reference as one that would have been "clearly capable" of leading to an unjust verdict. R. 2:10-2.

Lastly, insofar as defendant specifies, for the first time on appeal, additional facts about the 2018 assault that should have been sanitized, the trial court committed no plain error in that regard. See State v. Ross, 229 N.J. 389, 411-12 (2017). It was incumbent on defendant to specify these proposed deletions to the trial court in the first instance, to enable consideration with the input of opposing counsel. Id. at 407. We have nonetheless considered the appellate proposals and reject them. The deletions would have too severely

truncated the probative force of the 2018 assault evidence, as it bears upon permissible uses.

<u>Summary</u>

For these many reasons, we affirm the trial court's Rule 404(b) ruling, as defendant has failed to demonstrate an evidentiary error that caused a deprivation of his rights to due process and a fair trial. The court reasonably applied the <u>Cofield</u> factors and reached a logical and well-explained conclusion to admit the evidence under the exceptions for motive and identity.

## III.

In this unpublished portion of our opinion, we briefly address defendant's remaining issues, in the order presented in his brief.

## A.

The trial court did not err or deprive defendant of a fair trial in declining to excuse Juror #9 from deliberations. Although we are mindful of a defendant's constitutional right to a fair and impartial jury, <u>see</u> <u>State v. Byrd</u>, 261 N.J. 295, 312 (2025), the court here took adequate steps to assure that Juror #9 was "'capable of fulfilling [his] duty to judge the facts in a fair and unbiased manner . . . .'" <u>Ibid.</u> (quoting <u>State v. R.D.</u>, 169 N.J. 551, 558 (2001)).

The transcript of jury selection shows that Juror #9 initially voiced only modest concerns about missing shifts at his movie-theater job, and that he attested that he could and would undertake his responsibility and follow the court's instructions. When the court declined to excuse him, the juror thanked the judge and agreed that he would try to rearrange his work schedule to get some paid hours. The juror then served through the completion of the trial.

Days later, after the jury sent the judge a note expressing concerns about the juror's attentiveness during deliberations, the judge duly interviewed the foreperson and Juror #9 separately in chambers. Juror #9 agreed that he was "of course" willing to continue serving and would abide by the court's instructions. The judge invited both counsel to propose additional questions, and they declined. Neither counsel asked for the juror's removal from deliberations. Instead, they agreed to having the judge re-issue the standard jury charge about continued deliberations, which the judge accordingly delivered. The jury's verdict was then returned several hours later, after a lunch break.

We are satisfied the trial judge acted diligently and adequately to deal with the situation, and took "'appropriate measures to ensure the fair and proper administration'" of defendant's trial. State v. Little, 246 N.J. 402, 414 (2021) (internal citation omitted).

B.

Although not requested below, defendant argues the trial court should have sanitized certain text messages exchanged between A.A. and defendant before her death. The text messages were relevant and indicative of the nature of their relationship in the weeks leading up to the shooting. When the admissibility of the messages as a whole was discussed in the pretrial hearings, the court advised counsel that the court was going to admit them, but subject to the right of counsel to make specified requests for sanitization or redaction at the time of trial. Counsel made no such follow-up requests, and the messages were ultimately admitted into evidence.

On appeal, defendant contends that some of the text messages should have been excluded as "other crimes" evidence under N.J.R.E. 404(b) for reason of having been unduly prejudicial to him because they refer to defendant's involvement with A.A. and others in drug use and drug sales. We perceive no plain error in their admission. Ross, 229 N.J. at 411-12.

The messages were illuminating, on the whole, about the tenor of the couple's relationship and sufficiently relevant under N.J.R.E. 401. Moreover, to the extent that they at times refer to illegal drug usage and activity, we note that defendant's trial counsel attempted to make affirmative use of the messages as

suggestive that a drug dealer may have had a motive to kill A.A.  Defendant bypassed the court's invitation to sanitize or redact specific portions at trial.  Any error was invited.  See State v. A.R., 213 N.J. 542, 561 (2013).

C.

Lastly, we consider defendant's argument that the court improperly imposed an extended prison term upon him without a jury making factual findings of his eligibility as a persistent offender under N.J.S.A. 2C:44-3(a).  He contends the United States Supreme Court's June 2024 opinion in Erlinger v. United States, 602 U.S. 821 (2024), issued one month after his May 2024 sentencing, required the trial court to present the factual question of his persistent offender eligibility to a jury.

We have previously held that Erlinger is to be applied "retroactively to pipeline cases."  State v. K.H., 482 N.J. Super. 113, 141 (App. Div. 2025).  Very recently, however, on February 23, 2026, the New Jersey Supreme Court ruled in State v. Carlton, 262 N.J. 629 (2026), that such extended term sentences may remain intact if the State shows the omission of a jury was harmless.  Carlton, 262 N.J. at 633.

Here, the State has made a persuasive showing of such harmless error.  It is indisputable that defendant's long history of multiple adult convictions

justified his eligibility as a persistent offender for an extended term under the criteria of N.J.S.A. 2C:44-3(a). There was no meaningful fact-finding for a jury to conduct as to that issue. The court's seventy-year NERA sentence is accordingly affirmed.

## IV.

For the reasons stated above, we affirm defendant's conviction and sentence, including the pretrial judge's Rule 404(b) evidentiary ruling, in all respects. To the extent we have not addressed any arguments, they lack sufficient merit to warrant discussion. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

*M.C. Harley*

Clerk of the Appellate Division

A-3219-23